# IN THE SUPREME COURT OF CALIFORNIA

In re WILLIAM M. PALMER II
on Habeas Corpus.

S256149

First Appellate District, Division Two
A154269

---

January 28, 2021

Justice Cuéllar authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Kruger, Groban, and Grover* concurred.

Justice Liu filed a concurring opinion.

---

_____

* Associate Justice of the Court of Appeal, Sixth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

In re PALMER

S256149


Opinion of the Court by Cuéllar, J.


Judgments about the proper punishment for a crime are generally entrusted to the people's democratically elected representatives (see *Gregg v. Georgia* (1976) 428 U.S. 153, 175–176 (plur. opn. of Stewart, J.)) — and, in California, to the people themselves. (See, e.g., Voter Information Guide, Gen. Elec. (Nov. 4, 2014) text of Prop. 47, pp. 70–74; see generally Cal. Const., art. II, § 8.) Yet neither the Legislature nor the people have the final word. Both the state and federal Constitutions bar the infliction of punishment that is grossly disproportionate to the offender's individual culpability. (U.S. Const., 8th Amend.; Cal. Const., art. I, § 17.) So when a claim of constitutionally excessive punishment is properly presented, it is for the courts, "as coequal guardian[s] of the Constitution, to condemn any violation of that prohibition." (*In re Lynch* (1972) 8 Cal.3d 410, 414 (*Lynch*).) How courts should fulfill that responsibility when an inmate claims a sentence is excessive because of one or more parole denials is the question at the heart of this case.

William M. Palmer II first sought release on parole from the Board of Parole Hearings (Board) in 1995. The Board denied parole, but Palmer persisted. Following the Board's 10th denial, Palmer filed a petition for writ of habeas corpus. His petition alleged that the 30 years he had already served on a life sentence for an aggravated kidnapping committed when he was a juvenile was constitutionally excessive. Before the Court of

1

Appeal could adjudicate the habeas petition, the Board found him suitable for parole and ordered him released. (*In re Palmer* (2019) 33 Cal.App.5th 1199, 1202–1203 (*Palmer*).) The Court of Appeal subsequently agreed with Palmer that his now-completed term of imprisonment had become unconstitutional. (*Id*. at pp. 1207–1222.) Because that term had already been served, however, the Court of Appeal focused its order of relief on a different target. The court reasoned that Palmer was "entitled to release from all forms of custody, including parole supervision." (*Id*. at p. 1224.)

We agree with the Court of Appeal that habeas corpus relief is available to inmates whose continued incarceration has become constitutionally excessive, but who have been denied release by the Board. To the extent Palmer's continued incarceration at some point became constitutionally excessive, though, that alone did not justify ending his parole under the current statutory scheme. We therefore reverse the judgment of the Court of Appeal.

## I.

## A.

In 1988, when Palmer was 17 years old, he pleaded guilty to kidnapping for robbery. (Pen. Code, § 209, former subd. (b); all undesignated statutory references are to this code.) For this offense Palmer was sentenced to life imprisonment with the possibility of parole, consecutive to a two-year term for use of a firearm (former § 12022.5, subd. (a)). (*Palmer, supra*, 33 Cal.App.5th at p. 1202.)

His offense began in a parking garage at a Riverside apartment complex. Wearing a ski mask, Palmer waited there, intending to find someone to rob. He picked that location

because he had previously burglarized homes in the same area. When off-duty police officer Randy Compton exited his car, Palmer confronted him with an unloaded gun stolen in a previous burglary. Palmer demanded Compton's wallet. Compton claimed not to have one. Palmer asked Compton if he had a bank card; Compton said he did. Palmer then ordered Compton to drive to an automated teller machine (ATM) and withdraw $200. While Compton drove, Palmer sat in the backseat, pointing the unloaded gun at Compton. When they arrived at the ATM, Compton retrieved his service weapon from his backpack and fired 15 rounds at Palmer, hitting him in the knee. Palmer fled but was soon apprehended by the police. Shortly thereafter, he waived his *Miranda* rights and confessed. (*Palmer, supra,* 33 Cal.App.4th at pp. 1207–1208; see *Miranda v. Arizona* (1966) 384 U.S. 436.)

Palmer's juvenile record included driving without a license as well as lewd acts with three younger minors. While on probation for the latter offense, Palmer admitted committing several burglaries.

**B.**

Palmer filed the current habeas petition in the Court of Appeal. (*Palmer, supra,* 33 Cal.App.5th 1199.) This petition asserted that his continued incarceration for a crime committed in 1988 when he was 17 years old had become grossly disproportionate under the state and federal Constitutions. (See U.S. Const., 8th Amend.; Cal. Const., art. I, § 17.) Palmer complained that although there were 10 parole suitability hearings between 1996 and 2015, the Board denied him parole each time. Before the Court of Appeal could adjudicate the current habeas corpus petition, however, the Board found

Palmer suitable for release on parole — and then released him on parole for a five-year period. (*Palmer*, *supra*, 33 Cal.App.5th at pp. 1202–1203; see Pen. Code, former § 3000, subd. (b).)

The Court of Appeal retained the petition for adjudication and granted habeas corpus relief.[1] The court determined first that because Palmer remained constructively in custody while on parole, the petition was not moot. (*Palmer*, *supra*, 33 Cal.App.5th at p. 1203, citing *In re Sturm* (1974) 11 Cal.3d 258, 265.) The court then concluded that "in light of Palmer's age at the time of the offense and attendant diminishment of his culpability," the Board's repeated denials of parole rendered the 30 years he had served "so disproportionate to his individual culpability as to be 'constitutionally excessive' " within the meaning of the state and federal Constitutions. (*Palmer*, at p. 1214; see *id*. at p. 1221.) Because Palmer's prison sentence "had become constitutionally excessive" *before* his release on parole, the court reasoned, he was " 'entitled to be freed from all custody, actual or constructive.' " (*Id*. at p. 1223.) The court therefore ordered Palmer released from parole supervision. (*Id*. at p. 1224.)

On our own motion, we granted review to decide whether inmates may challenge their continued incarceration as constitutionally excessive when the Board repeatedly denies parole, and what remedy is available when continued incarceration becomes constitutionally excessive.

---

[1] Its opinion details the winding course of Palmer's prior habeas proceeding (*Palmer*, *supra*, 33 Cal.App.5th at pp. 1202–1203 & fn. 1; see *In re Palmer* (S252145, Supreme Ct. Mins., review dism., Apr. 30, 2020), but that history is not relevant here.

## II.

In general, fixing appropriate penalties for crimes is a distinctly legislative determination (e.g., *People v. Ward* (2005) 36 Cal.4th 186, 218; *People v. Dillon* (1983) 34 Cal.3d 441, 478 (*Dillon*)), implicating sensitive questions of policy and values that "are in the first instance for the judgment of the Legislature [or the people] alone." (*Lynch*, *supra*, 8 Cal.3d at p. 414.) But the legislative power to craft punishments is subject to constraints rooted in both the state and federal Constitutions. In limited circumstances, one or both provisions may relieve a defendant from a sentence that was otherwise lawfully imposed. (See *Hutto v. Davis* (1982) 454 U.S. 370, 374 (*per curiam*); *In re Dannenberg* (2005) 34 Cal.4th 1061, 1071 (*Dannenberg*).)

Palmer contends he has properly presented a claim that his punishment was cruel or unusual within the meaning of the state Constitution.[2] His habeas corpus petition alleges that his continued incarceration for more than 30 years — based on a crime he committed as a juvenile, in which no victim suffered injury — became "shocking and offensive."

Amicus curiae California District Attorneys Association (CDAA) disagrees. In CDAA's view, inmates should not be allowed to argue their continued incarceration has become constitutionally excessive unless a Board panel first finds "that he or she no longer represents a current threat to public safety."

---

[2] We analyze Palmer's claims exclusively under the California Constitution. Because he doesn't contend that the federal Constitution offers him any additional protection beyond that afforded by the state Constitution, no separate analysis of his federal claim is necessary. (Cf. *People v. Brooks* (2017) 3 Cal.5th 1, 43, fn. 4.)

In the absence of that predicate finding, CDAA warns, the Court of Appeal decision will authorize "a back-door challenge to lawful parole denials by the Board of Parole Hearings and new ad hoc challenges to the length of time served in all life-top sentences."

What we conclude is that the Board's denial of parole does not prevent inmates serving indeterminate terms, like Palmer, from challenging their continued incarceration as cruel or unusual under the California Constitution. Such challenges are neither novel nor improper, especially where (as here) the Board is not ever required, when making its parole decisions, to consider whether an inmate's punishment has become constitutionally excessive.

A trip through history shows why. Consider *In re Rodriguez* (1975) 14 Cal.3d 639 (*Rodriguez*), where this court sustained an inmate's challenge to his continued incarceration as cruel or unusual. Rodriguez had been sentenced to an indeterminate term of one year to life for lewd conduct with a child and, after serving 22 years in prison, filed a petition for writ of habeas corpus. (*Id.* at p. 642.) The petition included two distinct claims under the California Constitution: first, that the statutory life maximum term was disproportionate to the lewd conduct offense; and second, that the 22 years he had already served constituted excessive punishment. (*Rodriguez*, at p. 642.) After rejecting his claim that the statutory maximum life term was excessive "on its face" (*id.* at p. 648), we proceeded to consider whether the Adult Authority, the entity then charged with determining an inmate's actual period of incarceration, had imposed a disproportionate punishment by failing to fix Rodriguez's term at less than the maximum and by keeping him incarcerated for 22 years. It was our duty and obligation, we

explained, to ensure that the Adult Authority's term-fixing practices "comport with" the ban on cruel or unusual punishment set forth in article I, section 17 of the California Constitution. (*Rodriguez*, at p. 649.) To that end, we construed the indeterminate sentencing law (ISL) as requiring the Adult Authority to "fix terms within the statutory range that are not disproportionate to the culpability of the individual offender," since an inmate's maximum term "may not be disproportionate to the individual prisoner's offense." (*Id*. at p. 652.) Because Rodriguez had already served a term that was constitutionally disproportionate to his offense, we ordered him "discharged from the term under which he [was] imprisoned." (*Id*. at p. 656.)

After the adoption of the determinate sentencing law, the Board of Prison Terms (BPT) replaced the Adult Authority in deciding when indeterminate term prisoners could be released. (See § 5078, subd. (a).) We subsequently revisited the role that parole decisions play in fixing an inmate's actual term of incarceration. (See *Dannenberg*, *supra*, 34 Cal.4th 1061.) Under the version of section 3041 then in effect, the BPT was directed to fix firm parole release dates for eligible life prisoners. (Former § 3041, subd. (a); see *Dannenberg*, at p. 1090.) But subdivision (b) of that statute "made clear that the parole authority would have the express power and duty, in an individual case, to *postpone* the fixing of a firm release date, and thus to continue the inmate's *indeterminate* status within his or her life-maximum sentence, if it found that the circumstances of the prisoner's crime or criminal history presented a continuing risk to public safety." (*Dannenberg*, at p. 1090.) We recognized that the BPT's "paramount concern" for public safety under this scheme could end up imposing constitutionally disproportionate punishment in individual cases. (*Id*. at p. 1091; see *id*. at p.

7

1097.) What we also emphasized was that an inmate facing such punishment would have a judicial remedy: "those indeterminate life prisoners who have been denied parole dates, and who believe, because of the particular circumstances of their crimes, that their confinements have become constitutionally excessive as a result, may bring their claims directly to court by petitions for habeas corpus." (*Id*. at p. 1098.) Indeed, courthouse doors *had* to remain open to such challenges. Under the law as it then existed, the BPT was not required to set release dates for life-top prisoners who presented public safety risks. (*Ibid*.)

We revisited the scheme's operation a few years later under the BPT's successor, the Board of Parole Hearings. (Pen. Code, § 5075, subd. (a).) The Board's "paramount consideration" in making release determinations remained "whether the inmate currently poses a threat to public safety." (*In re Lawrence* (2008) 44 Cal.4th 1181, 1210.) If the inmate remains a danger, the Board "can, and must, decline to set a parole date." (*Id*. at p. 1227; see Cal. Code of Regs., tit. 15, § 2281, subd. (a) ["Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison"].)

Finally, when we decided *In re Butler* (2018) 4 Cal.5th 728, 744 (*Butler*), we reaffirmed the judiciary's critical role in ensuring that "an inmate sentenced to an indeterminate term []not be held for a period grossly disproportionate to his or her individual culpability." Inmates vindicate that constitutional right by bringing "their claims directly to court through petitions for habeas corpus" (*id*. at p. 745) — precisely as Palmer has done here.

We meant what we said in *Rodriguez* — and in *Dannenberg* and *Butler,* too. For well over four decades, we have consistently recognized that life-top inmates denied release on parole may bring their constitutional challenges directly to court. And when inmates do bring such claims, they are not limited to challenging only the statutory life maximum, as the Attorney General suggests. Nor does allowing inmates to challenge their continued incarceration in court represent "a radical break in the law governing life-top sentences," as CDAA contends. We allowed life-top inmates to challenge their years served under the ISL, and we have continued to allow such inmates to challenge their years served under the determinate sentencing law — regardless of whether the entity charged with setting a parole release date is the Adult Authority, the BPT, or the Board. In *Rodriguez*, *supra*, 14 Cal.3d 639, we sustained a challenge based on the actual number of years the petitioner had served. And in *Dannenberg*, *supra*, 34 Cal.4th 1061, we cited *Rodriguez* with approval on this point. (*Dannenberg*, at p. 1096.) Indeed, we reiterated that life prisoners who have been denied parole but "who believe, because of the particular circumstances of their crimes, that their confinements have become constitutionally excessive as a result, may bring their claims directly to court by petitions for habeas corpus" (*id*. at p. 1098), while noting that Dannenberg himself had made "no direct claim that the approximately 18 years he has spent behind bars is constitutionally disproportionate to his second degree murder." (*Ibid*.)

A life-top inmate remains free, of course, to challenge "the maximum term of imprisonment permitted by the statute," notwithstanding the possibility of securing parole at some earlier date. (*Lynch*, *supra*, 8 Cal.3d at p. 419.) Likewise, an

inmate may challenge the minimum term established by a statute, "without regard to the constitutionality vel non of the maximum." (*Id*. at p. 419, fn. 9; see *In re Foss* (1974) 10 Cal.3d 910, 919 (*Foss*).) But those are not the only cognizable objections to a prison sentence. Our precedent *also* demonstrates that an inmate may elect to challenge the constitutionality of the long years of imprisonment the inmate has served. In light of that precedent, Palmer's claim that he suffered cruel or unusual punishment cannot fairly be characterized as a "new" means of challenging his continued incarceration, nor did it depend on opening any "back-door." To the contrary: because the Board is not required to consider whether an inmate's life term has become constitutionally excessive if the inmate has not first been found suitable for parole, Palmer's claim can readily enter through the courthouse front door. Life-top inmates may test, in court, whether their continued punishment violates the Constitution.

## III.

The Attorney General claims that the Court of Appeal erred in sustaining Palmer's constitutional claim for yet another threshold reason. In his view, the Court of Appeal was wrong when it suggested, in this case, that "deference to the legislatively prescribed penalty is no longer a relevant factor, as the *actual* term of years served is a function of the Board's parole decisions, not the Legislature's determination of the appropriate penalty in this particular case." (*Palmer, supra*, 33 Cal.App.5th at p. 1206.) We agree with the Attorney General, to an extent: when a court assesses the constitutionality of a prison term, it must be mindful of the Legislature's broad discretion over the types and limits of punishment, regardless of whether the sentence being challenged is a specific term fixed by statute or

an indeterminate term where the Board has authority to order release within statutory parameters. It remains the judiciary's responsibility to decide whether a prison term has become excessive, and a court properly respects the Legislature's prerogative not by performing some ritualistic deference, but by analyzing the challenged punishment under the traditional, lenient legal standard we set forth in *Foss*, *supra*, 10 Cal.3d 910 and *Lynch*, *supra*, 8 Cal.3d 410.

In the discussion preceding its merits analysis, the Court of Appeal posited two categories of constitutionally excessive punishment claims, each governed by different rules. "Most claims," the court began, "challenge sentences when first imposed, looking prospectively at the time the offender *will* serve." (*Palmer*, *supra*, 33 Cal.App.5th at p. 1202.) These types of claims "rarely succeed," because courts "generally defer" to the legislatively defined punishment. (*Ibid*.) For those sentenced to indeterminate terms, on the other hand, the length of incarceration actually suffered "is determined not by the Legislature but by the Board's decision whether to grant or deny release on parole." (*Id*. at p. 1205.) So, the Court of Appeal suggested, "deference to the legislatively prescribed penalty is no longer a relevant factor" for this second category of claims. (*Id*. at p. 1206.)

As our cases underscore, however, deference is an important element in any disproportionality analysis. Regardless of whether an inmate challenges a sentence when first imposed or after repeated parole denials, the court's inquiry properly focuses on whether the punishment is "grossly disproportionate" to the offense and the offender or, stated another way, whether the punishment is so excessive that it " 'shocks the conscience and offends fundamental notions of

human dignity.' " (*Dillon, supra,* 34 Cal.3d at p. 478, quoting *Lynch, supra,* 8 Cal.3d at p. 424; see *Butler, supra,* 4 Cal.5th at p. 744 ["an inmate sentenced to an indeterminate term cannot be held for a period grossly disproportionate to his or her individual culpability"]; *id.* at p. 746 ["A sentence violates the prohibition against unconstitutionally disproportionate sentences only if it is so disproportionate that it 'shocks the conscience' "].)

Such an inquiry grants the Legislature considerable latitude in matching punishments to offenses. This latitude derives in part from the premise that a statute specifying punishment, like any other statute, is presumed valid unless its unconstitutionality " ' "clearly, positively and unmistakably appears." ' " (*Lynch, supra,* 8 Cal.3d at p. 415.) But it also accounts for a very particular context, one in which "[t]he choice of fitting and proper penalties is not an exact science, but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will; in appropriate cases, some leeway for experimentation may also be permissible." (*Id.* at p. 423.) A claim of excessive punishment must overcome a "considerable burden" (*People v. Wingo* (1975) 14 Cal.3d 169, 174), and courts should give " 'the broadest discretion possible' " (*Lynch,* at p. 414) to the legislative judgment respecting appropriate punishment. (See also *In re Coley* (2012) 55 Cal.4th 524, 540; accord, *Solem v. Helm* (1983) 463 U.S. 277, 290 ["Reviewing courts, of course, should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals"].) A

punishment does not qualify as constitutionally excessive unless it is " 'out of all proportion to the offense.' " (*Lynch, supra,* at p. 424.)

We've distilled three analytical techniques to aid our deferential review of excessiveness claims: (1) an examination of the nature of the offense and the offender, with particular attention to the degree of danger both pose to society; (2) a comparison of the punishment with the punishment California imposes for more serious offenses; and (3) a comparison of the punishment with that prescribed in other jurisdictions for the same offense. (See *Foss, supra,* 10 Cal.3d at pp. 919–920; *Lynch, supra,* 8 Cal.3d at pp. 425–428.) Our courts have invoked these techniques broadly across a variety of excessive punishment claims: when a defendant challenges the maximum term of imprisonment permitted by a statute (see *Lynch,* at p. 419), the minimum parole eligibility term (see *Foss,* at p. 919), ineligibility for probation (see *People v. Main* (1984) 152 Cal.App.3d 686, 691–697) — even the death penalty (see *People v. Bunyan* (1988) 45 Cal.3d 1189, 1240–1241).

The same core principles apply when an inmate challenges the years served on an indeterminate sentence. The Legislature has a continuing prerogative over the narrowed category of offenses that still warrant indeterminate sentences. (See *Dannenberg, supra,* 34 Cal.4th at pp. 1097–1098.) For this category of offenses, the Legislature has not abandoned its policymaking role. It has simply delegated to the Board the authority to fix a precise term within a statutory range the Legislature has identified, and under criteria the Legislature has articulated. (See § 3041; cf. *In re Larsen* (1955) 44 Cal.2d 642, 646–647; *In re Stanley* (1976) 54 Cal.App.3d 1030, 1038.)

Indeed, *Rodriguez* applied the traditional, deferential test in assessing whether the 22 years the habeas corpus petitioner had served under an indeterminate life sentence was constitutionally excessive. (*Rodriguez, supra*, 14 Cal.3d at p. 653 ["We reach the conclusion that the 22 years of imprisonment served by petitioner are excessive and disproportionate punishment by application of the *Lynch-Foss* analysis"].) And our reliance on that test in this distinct context was intentional: "these techniques are appropriate not only to the examination of statutes challenged on their face, but also to terms as fixed by the [Adult] Authority in individual cases." (*Id.* at p. 654.) The Court of Appeal similarly applied our traditional factors in *In re Wells* (1975) 46 Cal.App.3d 592, 596–603 (*Wells*) to determine whether the 20 years already served by the life-top inmate there was "grossly disproportionate" such that it " 'shocks the conscience.' " (*Id.* at p. 604.)

The Court of Appeal therefore erred in suggesting that deference to the legislative scheme is not a relevant consideration when inmates, such as Palmer, challenge their continued incarceration caused by the Board's repeated denial of parole. (*Palmer, supra*, 33 Cal.App.5th at p. 1206.) But the Attorney General hasn't identified any specific way in which the Court of Appeal's dictum might have affected its analysis of Palmer's sentence. Indeed, despite its insistence that Palmer was presenting a claim that was "different" in kind (*id.* at p. 1205) from "[m]ost claims of constitutionally excessive punishment" (*id.* at p. 1202), the Court of Appeal ended up testing the lawfulness of his punishment by using the traditional test required by our cases and undertaking an extensive analysis of each of the three *Lynch-Foss* techniques. (*Id.* at pp. 1207–1221.)

Whether the Court of Appeal correctly decided that Palmer's punishment was disproportionate is a question we need not resolve. While this petition was pending in the Court of Appeal, the Board found Palmer suitable for release and thereafter released him on parole. (*Palmer*, *supra*, 33 Cal.App.5th at p. 1203.) Consequently, Palmer would remain on parole even if we were to find that his continued incarceration had *not* become constitutionally excessive.

In light of these circumstances, we don't need to take up the "fact-specific inquiry" about whether Palmer's continued incarceration became cruel or unusual. (*Butler*, *supra*, 4 Cal.5th at p. 746; accord, *U.S. v. Rigas* (2d Cir. 2009) 583 F.3d 108, 123 [the shocks-the-conscience standard is "highly contextual and do[es] not permit easy repetition in successive cases"]; cf. *People v. McCullough* (2013) 56 Cal.4th 589, 592.) Even assuming his incarceration became disproportionate, that finding alone would not have automatically justified termination of his parole.

## IV.

In March 2019, the Board released Palmer to a five-year parole period. Palmer contends that the parole period should never have been imposed and asks this court to affirm the Court of Appeal's termination of it. In his view, once his prison term was determined to be constitutionally excessive, every additional day of custody — including the constructive custody of parole — is a constitutional violation. He relies on three cases where, construing the former ISL, a court ordered the successful habeas petitioner released from any and all custody. (See *Rodriguez*, *supra*, 14 Cal.3d at p. 656; *Lynch*, *supra*, 8 Cal.3d at p. 439; *Wells*, *supra*, 46 Cal.App.3d at p. 604.) Although these cases bear some factual similarities to the circumstances here,

the Legislature has since modified the applicable parole statutes and their relationship to an inmate's term of imprisonment. We therefore examine these cases and subsequent developments in the law.

Rodriguez filed a habeas corpus petition like Palmer's. What Rodriguez claimed was that his prolonged confinement under an indeterminate life sentence qualified as constitutionally disproportionate punishment. After concluding that Rodriguez's claim had merit and that he should "therefore . . . be discharged from the term under which he is imprisoned," we went on to direct — without explanation or citation to authority — that he be "discharge[d] . . . from custody." (*Rodriguez, supra*, 14 Cal.3d at p. 656; see *Lynch, supra*, 8 Cal.3d at p. 439 [stating, without elaboration, that having served a constitutionally excessive term, the petitioner "is therefore entitled to his freedom"].) Similarly, in *Wells*, the petitioner successfully argued that his continued incarceration was constitutionally disproportionate. The Court of Appeal declared — again without explanation or authority — that he "is entitled to be freed from all custody, actual or constructive." (*Wells, supra*, 46 Cal.App.3d at p. 604.)

Cutting across these cases was an implicit rationale — one we can readily discern from the sentencing scheme in place at the time. All of these cases were decided under the former ISL. (See *People v. Jefferson* (1999) 21 Cal.4th 86, 94 (*Jefferson*) ["Before July 1, 1977, California law provided for indeterminate sentencing"].) Under that scheme, the trial court sentenced a defendant to prison for " 'the term prescribed by law.' " (*Ibid.*) This unitary "term" represented " 'the total time the state had jurisdiction over the prisoner,' " whether in actual custody or constructive custody. (*Id.* at p. 95.) The Adult Authority had

the power to decide when an inmate could be released on parole (*id.* at p. 94) — as well as the power to select a term within the statutory maximum and minimum (*ibid.*) — but the time spent in prison and the time spent on parole together comprised a *single* term. (*Id.* at p. 95 [" 'The parole date was the date of release from actual custody, but the balance of the "term" was to be served on parole' "].)

So when we decided in *Rodriguez,* for example, that the habeas corpus petitioner should be discharged from his "term," it necessarily followed that he would be discharged "from custody," including the constructive custody of parole. (*Rodriguez, supra,* 14 Cal.3d at p. 656; see *Wells, supra,* 46 Cal.App.3d at p. 604.) Once the "term" was found to be excessive, the legal basis for continuing custody — whether actual or constructive — necessarily evaporated.

Not so under the current sentencing scheme. Under post-1977 law, " 'Parole is no longer service of the term.' " (*Jefferson, supra,* 21 Cal.4th at p. 95.) It is instead a separate period *following* completion of the term. (*Ibid.*) " ' *"Term" now means the period of actual confinement prior to release on parole.'* " (*Ibid.*, italics in *Jefferson.*) Accordingly, a finding that an inmate's prison term is constitutionally excessive no longer has any inherent effect, by itself, on the validity of the separate parole term. Cases decided under the ISL — where the unitary "term" might have been served either in prison or on parole, in the discretion of the Adult Authority — have no application to parole as envisioned in the current sentencing scheme. Whether service of an excessive prison term should affect a parole term under current law is not an issue our courts have resolved.

A court considering a petition for writ of habeas corpus has broad authority to craft a remedy "as the justice of the case may require." (§ 1484; see *In re Lira* (2014) 58 Cal.4th 573, 584 (*Lira*).) Invoking that power, Palmer contends that "[b]ecause parole is punishment, the only remedy that cures the ongoing violation of [his] constitutional rights is discharge from parole." We agree that parole *is* punishment. (*People v. Nuckles* (2013) 56 Cal.4th 601, 608–609 (*Nuckles*).) What's missing from Palmer's argument, though, is any authority or argument to support the proposition that when one kind of punishment is constitutionally excessive, other forms of punishment must also be invalidated. Monetary fines and orders of restitution, for example, may constitute punishment. (See, e.g., *People v. Hanson* (2000) 23 Cal.4th 355, 357; *People v. Zito* (1992) 8 Cal.App.4th 736, 741; § 1202.4, subd. (a)(3); accord, *U.S. v. Dubose* (9th Cir. 1998) 146 F.3d 1141, 1144–1145.) Still, it seems quite unlikely that the payment of an excessive fine or order of restitution would automatically relieve a defendant from serving an otherwise lawful prison term. Nothing in our grant of relief in *Rodriguez* or in the other cases above purported to invalidate any distinct kind of punishment. To the contrary: Under the applicable scheme at the time those cases were decided, parole and imprisonment were complementary parts of a unitary "term." By invalidating the *term* as constitutionally disproportionate, we necessarily relieved the habeas petitioner from serving any part of the term.

True: imprisonment and parole both involve custodial forms of punishment, and each "constitutes part of the punishment for the underlying crime." (*Nuckles, supra*, 56 Cal.4th at p. 608.) Though parole and imprisonment are often tethered, they are not so entangled that a defect in one form of

custody necessarily and fatally infects all forms of custody. Imprisonment, for example, may become cruel or unusual because of substandard conditions of confinement. (See, e.g., *In re Coca* (1978) 85 Cal.App.3d 493, 501–503.) Yet never have we held that inmates who successfully challenge their conditions of confinement — and secure an amelioration of those conditions — would be entitled to their freedom before their sentences have ended. (Cf. *People v. Jackson* (1987) 189 Cal.App.3d 113, 120 ["Just as the release of inmates from custody is not an appropriate remedy to established unconstitutional conditions of confinement [citations], we do not believe the proper remedy is judicial reduction of sentence terms"]; *Coca*, at p. 503 ["we agree that the court could not on these facts require respondent's release"].) A constitutional error involving one aspect of punishment does not inevitably and fatally infect all other aspects.

Nor are we persuaded that "the justice of the case" (§ 1484) requires termination of Palmer's parole. Parole is a "distinct phase" from a term of imprisonment and serves different objectives. (*Nuckles, supra*, 56 Cal.4th at p. 609.) Unlike a prison sentence, whose objective is to protect society, punish offenders, and deter future crime, parole's primary objective " 'is, through the provision of supervision and counseling, to assist in the parolee's transition from imprisonment to discharge and reintegration into society.' " (*Id.* at pp. 608–609.) At least when parole works as intended, it is a sufficiently vital part of the rehabilitation process that ought not be categorically discarded simply because an inmate establishes that the preceding period of incarceration became constitutionally disproportionate. (See generally *Foss, supra*, 10 Cal.3d at p. 923 ["also relevant to determining whether a sentence is

disproportionate to the offense and offender, is a consideration of the penological purposes of the punishment imposed in light of the particular offense"].)

The Legislature has long acknowledged parole's importance. By statute, the Legislature has found "the period immediately following incarceration is critical to successful reintegration of the offender into society and to positive citizenship. It is in the interest of public safety for the state to provide for the supervision of and surveillance of parolees and to provide educational, vocational, family and personal counseling necessary to assist parolees in the transition between imprisonment and discharge." (Former § 3000, as amended by Stats. 1982, ch. 1406, § 2, p. 5361; see § 3000, subd. (a)(1); see generally *Lira, supra,* 58 Cal.4th at p. 579.) These services include medical and psychological treatment, drug and alcohol dependency services, job counseling, and programs that enable the parolee to obtain a general equivalency certificate. (See *In re Taylor* (2015) 60 Cal.4th 1019, 1030.) For someone like Palmer, who was convicted at age 17 and remained behind bars for the next 30 years, it is difficult to see how justice would be advanced by releasing him into the community to live as an adult — for the first time — without any supervision or supportive services.

Palmer complains that certain parole conditions "can be extremely punitive in a specific individual's case" in that they "bear no relation to his underlying offense, severely inhibit his ability to successfully reintegrate, and deny him fundamental freedoms enjoyed by non-parolees." Amici curiae The Prison Law Office et al. argue generally that parole, as practiced in this country, undermines rehabilitation and is ineffective in reducing recidivism. Neither point justifies termination of

Palmer's parole in *this* proceeding, however. Palmer's current habeas corpus petition challenges parole categorically, not particular parole conditions as unduly punitive "in [his] specific . . . case." (Cf. *In re Stevens* (2004) 119 Cal.App.4th 1228, 1231, 1233–1239.) Nor has he developed a record to show that parole, in itself, is so fatally and unduly punitive as to violate article I, section 17 of the state Constitution — or that parole, following 30 years of incarceration, would necessarily be cruel or unusual. Our opinion should not be read to foreclose such claims.

Palmer argues next that his parole must be terminated to avoid an "absurd" scenario: a violation of parole "may" in theory cause a parolee to be returned to custody, yet *he* could never actually be reincarcerated in light of the Court of Appeal's finding that he had already served a constitutionally disproportionate term. This claim, too, fails to persuade. Nothing in the statutory scheme requires incarceration of a parolee who's been found to have violated one or more parole conditions. The parole agency may instead impose additional conditions of supervision, including rehabilitation and treatment services with appropriate incentives for compliance, as well as intermediate sanctions short of incarceration. (§ 3000.08, subd. (d); see Cal. Rules of Court, rule 4.541(e).) Even when these options prove inadequate, a court may nonetheless refer the parolee to a reentry court or another evidence-based program. (§ 3000.08, subd. (f)(3).) So Palmer is mistaken in asserting that there could be "no constitutional consequence for any violation of a parole condition by Mr. Palmer." In any event, the current petition does not challenge any period of reincarceration arising from Palmer's violation of parole. (Cf. *U.S. v. Bridges* (7th Cir. 1985) 760 F.2d 151, 154 ["Any imprisonment that might result from parole revocation

some time in the future is . . . only speculative at this point and does not present an appropriate question for decision"].) Consequently, we need not decide whether reincarceration of a parolee would run afoul of the state Constitution, where, as here, the parolee claims that continued incarceration has become excessive.

Finally, we part company with the Court of Appeal's reading of *Lira*. The Court of Appeal purported to distinguish *Lira*, where we similarly refused to reduce the habeas corpus petitioner's parole period, on the ground that "the prisoner in *Lira* was never serving an unlawful sentence." (*Palmer*, *supra*, 33 Cal.App.5th at p. 1223.) A close reading of our decision renders that characterization questionable.

Lira, a life prisoner, was found suitable for parole and given a release date, but the Governor reversed the Board's decision. Lira filed a habeas corpus petition challenging the reversal as unsupported by the evidence. (*Lira*, *supra*, 58 Cal.4th at p. 577.) While the petition was pending, the Board again found Lira suitable for parole. The Governor did not disturb this second suitability finding, and Lira was released on parole. (*Ibid*.) In ruling on the habeas corpus petition, the Court of Appeal agreed with Lira that the Governor's reversal of the Board's earlier grant of parole was unlawful and ordered that Lira be given credit against his maximum five-year parole term for the time he had spent in prison between the Governor's erroneous reversal and his eventual release. (*Id*. at p. 578.) We granted the Attorney General's petition for review, which challenged only the award of credits, and reversed. (*Id*. at p. 578 & fn. 2.) We reasoned that the Governor had independent constitutional authority to review parole suitability determinations and rejected, in particular, Lira's argument that

"the Governor's reversal, later judicially determined to be unsupported, somehow retroactively rendered unlawful the period of his continued incarceration during the pendency of these processes." (*Id.* at p. 582.) Because Lira "was lawfully imprisoned during this period until the day he was released" — and "received credit against his term of life imprisonment for all such days" — he was "not entitled to any credit against his parole term." (*Ibid.*)

But our analysis did not stop there. *Lira* declined to award relief even if one assumed "the asserted unlawfulness of the portion of his term of imprisonment that followed the Governor's 2009 reversal." (*Lira, supra,* 58 Cal.4th at p. 582.) Because parole is a distinct phase of punishment — which begins "only after release from prison" (*ibid.*) — a reduction in the parole term, even if limited to a showing of unlawful confinement, "would undermine the Legislature's intent in requiring the service of three continuous years of parole after release from confinement and therefore must be rejected." (*Id.* at p. 583.) We also rejected Lira's claims that "fundamental fairness" and "substantive due process" entitled him to a reduction in his parole term, even assuming his confinement had been rendered "retroactively unlawful" and he thereby suffered "a temporary infringement of his right to a factually supported suitability decision by the executive branch." (*Id.* at pp. 584–585.)

We find *Lira* instructive on the question whether Palmer's parole should automatically have been modified or eliminated as soon as his continued incarceration became unlawful. Palmer remains free — as the Attorney General concedes — to challenge his parole term as cruel or unusual, either on its own terms or because continued parole, when combined with a prolonged period of excessive imprisonment, would be constitutionally

cruel or unusual. But we reject his current claim that he was automatically entitled to "an end to all custody and punishment" at the moment his continued incarceration became excessive.

## V.

The California Constitution prohibits punishment that is cruel or unusual. (Cal. Const., art. I, § 17.) Because courts play a pivotal role in giving these words effect, a life-top inmate whose imprisonment has become excessive — but who has been denied parole by the Board — must be able to obtain relief in court by filing a petition for writ of habeas corpus. When a court adjudicates such a petition, it applies our long-standing test to discern whether punishment is cruel or unusual. If a court then finds the inmate's continued confinement has become excessive, it may order the inmate's release from prison.

What such release does not guarantee is automatic termination of the inmate's statutory parole period. Under a statutory scheme that treats parole as a distinct phase of punishment, and in the absence of any persuasive argument from Palmer that his parole term has separately or in combination with his years of imprisonment become constitutionally excessive, his parole remains valid. Because the Court of Appeal erred in ending Palmer's parole, we reverse the judgment.

**CUÉLLAR, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**KRUGER, J.**
**GROBAN, J.**
**GROVER, J.**[*]

---

[*] Associate Justice of the Court of Appeal, Sixth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

In re PALMER
S256149


Concurring Opinion by Justice Liu


I join Parts I, II, and III of today's opinion. I agree that "habeas corpus relief is available to inmates whose continued incarceration has become constitutionally excessive, but who have been denied release by the Board [of Parole Hearings]." (Maj. opn., *ante*, at p. 2.) And I agree that although the Court of Appeal erred in suggesting that deference to the Legislature "is not a relevant consideration when inmates, such as [petitioner William] Palmer, challenge their continued incarceration caused by the Board's repeated denial of parole," the error did not impact its proportionality analysis. (*Id.* at p. 14.) I cannot discern any meaningful difference between the Court of Appeal's analytical approach and the approach taken in *In re Rodriguez* (1975) 14 Cal.3d 639, 653–656 and *In re Wells* (1975) 46 Cal.App.3d 592, 597–604.

In addition, I agree with the court's holding in Part IV that a finding of excessiveness with regard to incarceration does not "automatically" rule out imposition of parole. (Maj. opn., *ante*, at p. 24.) But I write separately to make two points.

First, today's opinion declines to "decide whether reincarceration of a parolee would run afoul of the state Constitution, where, as here, the parolee claims that continued incarceration has become excessive." (Maj. opn., *ante*, at p. 22.) I would make clear that a finding of excessiveness as to incarceration necessarily entails that a parolee may not be reincarcerated for violating parole. The court says the prospect

1

of Palmer's reincarceration for violating parole is " 'only speculative at this point.' " (*Ibid.*)  But I see no reason why we should not settle this issue and afford Palmer some peace of mind.  As a matter of logic, it ineluctably follows from the Court of Appeal's excessiveness finding that Palmer may not be lawfully reincarcerated for his 1988 crime.

Parole "is a form of punishment accruing directly from the underlying conviction" and "is a direct consequence of a felony conviction and prison term."  (*People v. Nuckles* (2013) 56 Cal.4th 601, 609.)  Ordinarily, if a parolee violates a parole condition, the state may " 'return the individual to imprisonment without the burden of a new adversary criminal trial.' "  (*Ibid.*)  The court today holds that because parole is "a distinct phase of punishment," a finding of excessive incarceration does not automatically entitle the defendant to termination of all custody, including parole.  (Maj. opn., *ante*, at pp. 23–24.)

While accepting this holding, I would take the analysis one step further.  The Court of Appeal ruled that Palmer's period of incarceration was "so disproportionate to his individual culpability for the offense he committed, that it must be deemed constitutionally excessive."  (*In re Palmer* (2019) 33 Cal.App.5th 1199, 1202.)  Assuming, as today's opinion does, that Palmer "has already served a prison term grossly disproportionate to his offense" (*id.* at p. 1224), I do not see how it could be lawful to reincarcerate Palmer if he violates parole.  Reincarcerating Palmer in this manner would be a resumption of precisely the same imprisonment that the Court of Appeal has adjudged unconstitutional.  Palmer simply cannot be returned to prison as further punishment for his 1988 crime.

As to what parole conditions are permissible for an individual in Palmer's circumstances, today's opinion properly emphasizes conditions that serve a rehabilitative function. (Maj. opn., *ante*, at p. 20.) Parole conditions in a case like Palmer's must be careful to avoid incremental incursions on liberty that exacerbate the disproportionality of punishment resulting from an excessive period of incarceration. And parole terms may be backed up only by incentives, sanctions, or alternatives "short of incarceration." (*Id.* at p. 21.)

Second, today's opinion notes that although the excessiveness of Palmer's incarceration does not automatically entitle him to be free of custody, "Palmer remains free . . . to challenge his parole term as cruel or unusual, either on its own terms or because continued parole, when combined with a prolonged period of excessive imprisonment, would be constitutionally cruel or unusual." (Maj. opn., *ante*, at pp. 23–24.) The premise of this invitation is that the Court of Appeal's termination of Palmer's parole was erroneous because it relied on a rule of automatic entitlement that today's opinion rejects. (See *In re Palmer*, *supra*, 33 Cal.App.5th at p. 1223 ["[H]is continued imprisonment was *unlawful*. He is, therefore, 'entitled to be freed from all custody, actual or constructive.' "].)

But that is not the only reading or the most plausible reading of the Court of Appeal's opinion. Instead of holding that a finding of excessive incarceration automatically entitles a defendant to be free of all custody, the Court of Appeal arguably concluded, on the facts here, that Palmer's 30 years of incarceration for his 1988 crime was so disproportionate that it left no room for any further restraint or punishment in his case. (See *In re Palmer*, *supra*, 33 Cal.App.5th at pp. 1207–1214 [finding Palmer's 30 years of imprisonment to be "grossly

3

disproportionate" based on a detailed examination of his 1988 crime and his relative youth and mitigating background]; *id.* at p. 1224 [examining specific restrictions in Palmer's parole term and finding it "difficult to comprehend how his release under such conditions can be seen as anything other than continued restraint and punishment for his crime"].)  In other words, the Court of Appeal appears to have reached an *individualized* conclusion as to the unlawfulness of the parole term *in Palmer's case*.  If that is so, then Palmer's litigation of this very point in further proceedings will be redundant.

The latter strikes me as the more natural reading of the Court of Appeal's opinion as a whole.  But the issue will likely be clarified soon enough in further proceedings.

**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re Palmer
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted**  XXX 33 Cal.App.5th 1199
**Rehearing Granted**
_____

**Opinion No.** S256149
**Date Filed:**  January 28, 2021
_____

**Court:**
**County:**
**Judge:**


_____

**Counsel:**

O'Melveny & Myers, Geoffrey Yost, Anna Pletcher, Melody Drummond Hansen, Megan Havstad, Cara L. Gagliano, Micah Chavin, Michael J. Pierce, Anna Schneider and Mehwish Shaukat for Petitioner William M. Palmer II.

Jerome N. Frank Legal Services Organization, Marisol Orihuela and Miriam Gohara for The Prison Law Office, Vincent Schiraldi and David Muhammad as Amici Curiae on behalf of Petitioner William M. Palmer II.

Keker, Van Nest & Peters, Sharif E. Jacob and Taylor Reeves for Professor Vincent Schiraldi, Columbia University School of Social Work, as Amicus Curiae on behalf of Petitioner William M. Palmer II.

Munger, Tolles & Olson, William D. Temko, Sara A. McDermott and Michele C. Nielsen for Human Rights Watch and The Pacific Juvenile Defender Center as Amici Curiae on behalf of Petitioner William M. Palmer II.

Kristen Bell for The Sentencing Project as Amicus Curiae on behalf of Petitioner William M. Palmer II.

William Vogel as Amicus Curiae on behalf of Petitioner William M. Palmer II.

Elbert Lee Vaught IV as Amicus Curiae on behalf of Petitioner William M. Palmer II.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Phillip J. Lindsay, Assistant Attorney General, Sara J. Romano, Amanda J. Murray and Denise A. Yates, Deputy Attorneys General, for Respondent Board of Parole Hearings.

Mark Zahner and Richard J. Sachs for California District Attorneys Association as Amicus Curiae on behalf of Respondents Board of Parole Hearings and California Department of Corrections and Rehabilitation.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Megan Havstad
O'Melveny & Myers, LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111-3823
(415) 984-8700

Amanda J. Murray
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9084