Filed 6/9/21  P. v. Garcia CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>　Plaintiff and Respondent,<br><br>　　v.<br><br>JOSE CRUZ ARANDA GARCIA,<br><br>　Defendant and Appellant. | G058622<br><br>(Super. Ct. No. 18CF0482)<br><br>O P I N I O N |

　　　　　Appeal from a judgment of the Superior Court of Orange County, Steven D. Bromberg, Judge.  Affirmed.

　　　　　DardenLawGroup and Christopher A. Darden for Defendant and Appellant.

　　　　　Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Scott C. Taylor, Deputy Attorneys General, for Plaintiff and Respondent.

　　　　　　　　*　　　　　　*　　　　　　*

A jury convicted Jose Cruz Aranda Garcia of two counts of committing lewd acts against his niece, a child under the age of 14. (Pen. Code, § 288, subd. (a); counts 1 and 2.)[1] The jury also convicted him of oral copulation of a child under the age of 10, the same victim. (§ 288.7, subd. (b); count 3.) The trial court sentenced Garcia to 15 years to life on count 3, plus a 10-year consecutive determinate term on the remaining counts.

On appeal, Garcia contends he received ineffective assistance of counsel (IAC) in two respects. First, he argues his attorney was deficient because he did not seek to exclude statements made by an officer during Garcia's police interview, including relaying the niece's accusations with comments suggesting they were credible. Second, Garcia contends his sentence of 15 years to life on count 3 constitutes cruel and unusual punishment. Neither claim has merit. We therefore affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

J.L.'s paternal aunt and her husband, Garcia, babysat J.L. in their home from when she was two months old through second grade. Garcia began abusing J.L. when she was five years old and in kindergarten; he continued the abuse more than a dozen times over the next two years.

Sometimes he unbuckled his pants on the living room couch, pulled out his penis under a blanket covering them both from the waist down, and used her hand to masturbate until he ejaculated. Other times he touched her thigh or had her rub his clothed crotch and then put her hands in his pants on his penis until it was slimy. He would have her wash her hands in the bathroom and order her not to tell anyone, which frightened her.

---

[1]  All further statutory references are to this code.

Twice Garcia grabbed J.L.'s hand tightly, walked her into a bedroom, and forced her to orally copulate him there, squeezing her cheeks very hard until she opened her mouth. She tried to push him away but he grabbed her hair, kept his hand on the back of her head, and forced her head back and forth until he ejaculated. He would then direct her again not to tell anyone.

In ninth grade, J.L. disclosed the abuse to her mother. J.L. thereafter confirmed the abuse to a social worker and a police officer.

At the direction of a Santa Ana Police Department (SAPD) corporal, J.L. made a covert call to Garcia. Garcia denied making her touch his penis when she was younger, but then stated, "if I did something well . . . forgive me but the truth is that I don't remember." In subsequent text message exchanges with the corporal posing as J.L., Garcia first responded that he did not remember making her touch his penis or put it in her mouth. But he asked, "What do you want me to do so you can forget?" He warned her, "This is very serious, and you're going to lose one whole family." He asked J.L. who she had told about the abuse, then he denied ever having her orally copulate him.

Following Garcia's arrest, he told the SAPD corporal he believed he was being interviewed about J.L. because she once walked in on him while he was showering. He told her to leave the room, which she did, and that was "all that [had] happened with me."

Garcia initially denied making J.L. touch his penis, but later admitted "if I did that, maybe just one or two times." He claimed that nothing actually happened the first time because, when he unzipped his pants and pulled out his penis "the girl took off and left." The second time he "grabbed her hand . . . to touch it," but she again departed. When the corporal reported that J.L. "said that you grabbed her hand [and] placed it on your penis," Garcia replied, "Yes, yes." Garcia claimed J.L. initiated the second encounter as "if she liked it." He insisted she "got close [to him] on her own" and "just touched it," but he denied any masturbation or oral copulation ever occurred.

3

At the close of the interview, Garcia wrote J.L. an apology letter: "I repent from what I did to you. And I want you to forgive me. I am here in jail. But what you say about the mouth, that is not true. And I ask you to forgive me."

**DISCUSSION**

1. *Police Interview*

Garcia concedes his police interview was generally admissible since it was a party admission (Evid. Code, § 1220), but contends "there are statements made by Corporal Bonilla, within [the interview], that should have been excluded." Garcia argues his trial attorney's failure to object to those remarks constituted ineffective assistance of counsel, requiring reversal. A video recording of the interview was played for the jury at trial; Garcia now contends Bonilla's statements amounted to improper vouching for J.L.'s abuse claims.

An appellant asserting IAC must show that his or her counsel's performance fell below prevailing professional standards and was prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-694.) IAC claims, as mixed questions of fact and law, are "generally subject to independent review as predominantly questions of law . . . ." (*People v. Ledesma* (1987) 43 Cal.3d 171, 219.) The record must "affirmatively disclose[] that counsel had no rational tactical purpose for his act or omission." (*People v. Fosselman* (1983) 33 Cal.3d 572, 581.)

Garcia premises his vouching claim on several remarks Bonilla made during the interview while pressing Garcia to admit the abuse J.L. reported. Bonilla had been one of the officers who arrested Garcia. He told Garcia in a somewhat garbled fashion that the purpose of the interview was to "ensure . . . everything that she has told us up to now results to be true." After Garcia admitted having J.L. touch his penis, but repeatedly denied any oral copulation, Bonilla confronted him: "So then, why is she

4

going to lie that you put your penis in her mouth." Garcia answered, "I don't know, I don't know, I don't know why she would lie but that's not true."

Early in the interview, Bonilla told Garcia "she has not changed her, her story about what happened between you and her." At that point, Garcia still denied the lewd touching, but Bonilla insisted, "I already know the truth." Bonilla repeated the phrase, stating, "Yes, the only thing that we are looking for right now is the truth, right. I already know the truth." While Garcia thereafter admitted that "if" he had made J.L. touch him, it was "maybe just one or two times," he firmly and consistently denied oral copulation throughout the interview, from beginning to end.

We find no merit in Garcia's IAC claim because an officer's statements to a defendant during an interview are generally admissible "for the nonhearsay purpose of giving context to . . . answers." (*People v. Riccardi* (2012) 54 Cal.4th 758, 801-802, fn. 21, overruled on other grounds in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

In *People v. Maciel* (2013) 57 Cal.4th 482, for example, the Supreme Court held: "[C]ontrary to defendant's assertion, the officers' statements that defendant had 'set . . . up' the murders in this case were not 'inadmissible hearsay.' Rather, they served the nonhearsay purpose of giving context to defendant's responses. [Citation.] Moreover, the court instructed the jury that law enforcement officers were permitted to misrepresent evidence in their possession in order to motivate a suspect to confess, and that the officers' 'allegation[s]' in this case were '*not received for the truth of any allegation* but because it is part of the statement and helps you judge the response of the defendant.' . . . Thus, there is no reasonable likelihood the jury 'would consider [the] investigators' statements on the [tape] as substantive evidence of [defendant's] guilt.'" (*Id*. at p. 524.)

The trial court did not give the jury a similar instruction here, but did remind the jurors: "You alone must judge the credibility or believability of the witnesses." (CALCRIM No. 226.) We presume the jury followed this admonition and

5

treated Bonilla's remarks as those of an arresting officer, whom the jury would understand naturally believed he had grounds for the arrest. The court's instructions, including concerning reasonable doubt, directed the jury to disregard stray considerations regarding the believability of any witness. (*People v. Harris* (2005) 37 Cal.4th 310, 350.) In particular, the court told the jury, "You must not be biased against the defendant just because [he] has been arrested, charged with a crime, or brought to trial." (CALCRIM No. 103.)

We are confident based on these instructions that the jury regarded Bonilla's statements to be those of an advocate in the legal system's adversarial process, rather than as gospel truth. (Cf. *People v. Clair* (1992) 2 Cal.4th 629, 663, fn. 8 ["jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade"].) Juries "'certainly understand'" the "'variety of ways'" in which an interrogating officer may express disbelief of a suspect's denials "'to be the police position and would give to it no more weight than they would the fact appellant was charged by the prosecutor with murder or that the prosecutor clearly also disbelieved appellant.'" (*Dubria v. Smith* (2000) 224 F.3d 995, 1001, fn. 2 (*Dubria*).)

Bonilla did not offer an opinion at trial regarding J.L.'s credibility; his remarks during the interview therefore do not violate the rule barring a witness from opining about the credibility of another witness's testimony. (See, e.g., *People v. Stitely* (2005) 35 Cal.4th 514, 546.) Officer "questions in a pre-trial interview that g[i]ve context to [the defendant's] answers" are "not the types of statements that carry any special aura of reliability." (*Dubria*, *supra*, 224 F.3d at p. 1002.)

In any event, we find no basis for reversal because defense counsel's evident decision not to object apparently had a tactical basis. In closing argument, defense counsel highlighted Garcia's steadfast denial of the oral copulation charge—in contrast to the lewd touching allegation and despite Bonilla's similar tactics to elicit a

6

confession to both types of abuse. Defense counsel emphasized "the most important thing to take away from" the interview was the "16 times" that Garcia denied "the oral copulation," despite Bonilla's insistence. Defense counsel specifically referred the jury to consider Bonilla's interrogation stratagem urging Garcia, "Come on, tell me. I already know. Just tell me." Defense counsel emphasized Garcia's truthfulness in admitting to touching J.L., inviting a similar conclusion as to his veracity because "when it comes to the oral copulation, he's adamant, no, no. Even when the officer is getting into his face about it . . . ." Counsel urged the jury to "look at that video inside the jury room" to see that "as he's being confronted with the oral copulation," Garcia's "back had stiffened up. . . . He's denying it over and over. His body language is telling you it didn't happen."

Just as the jury was entitled to consider Bonilla's questions and tactics to understand the context of the interview as a whole, including how Garcia's initial denial of the lewd touching allegation evolved into an admission, defense counsel was entitled to emphasize that Garcia's consistent denial regarding oral copulation did *not* evolve. Defense counsel determined—by not objecting—that the full context of Bonilla's questioning supported this defense. An attorney's "'choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on appeal.'" (*People v. Riel* (2000) 22 Cal.4th 1153, 1197.) Because "we cannot eliminate the probability that defense counsel had valid tactical reasons for not objecting" (*People v. Jones* (2009) 178 Cal.App.4th 853, 860) to playing the full video interview, including Bonilla's interrogation methods as a whole, Garcia's IAC claim has no merit.

2.    *Sentence*

Garcia contends his sentence of 15 years to life on count 3 violates state and federal constitutional norms because it is unmerited for the offense and disproportionate to his culpability. He notes the existence of other "arguably . . . more heinous" crimes that do not garner a life sentence. He stresses that he was 58 years old at

7

the time of sentencing, had no prior criminal history, and cites in his favor his "stable" family life, married life, and employment history. He denies his offenses were sexually motivated and laments "the likelihood that [he] will die in prison."

Garcia forfeited his proportionality challenge by failing to raise it below. (*People v. Norman* (2003) 109 Cal.App.4th 221, 229.) Nevertheless, we address the claim in the context of his IAC contention, and find on our de novo review that it has no merit. (*People v. Baker* (2018) 20 Cal.App.5th 711, 720, 722 (*Baker*).) Counsel was not required to raise futile objections. (*Id.* at p. 720.)

In prohibiting punishment that is "cruel" or "unusual," or both, the federal and state constitutions "prohibit punishment that is 'grossly disproportionate' to the crime or the individual culpability of the defendant." (*People v. Mendez* (2010) 188 Cal.App.4th 47, 64; see U.S. Const., 8th Amend.; Cal. Const., art. I, § 17.) But "[o]utside the death penalty context, "'successful challenges to the proportionality of particular sentences have been exceedingly rare."'" (*People v. Reyes* (2016) 246 Cal.App.4th 62, 83.)

This "exquisite rarity" (*People v. Weddle* (1991) 1 Cal.App.4th 1190, 1196) stems from the requisite judicial deference to "our tripartite system of government," in which "it is the function of the legislative branch to define crimes and prescribe punishments." (*In re Lynch* (1972) 8 Cal.3d 410, 414.) Here, Garcia does not meet his "considerable burden" to override the sentence (*People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 529) because he fails to demonstrate it is clearly, positively, and unmistakably unconstitutional. (*People v. Rhodes* (2005) 126 Cal.App.4th 1374, 1390.)

Simply put, "It is well within the prerogative of the Legislature to determine that sex offenses against young children are deserving of longer sentences than sex offenses against adults or nonsex offenses." (*People v. Gomez* (2018) 30 Cal.App.5th 493, 502 (*Gomez*).) "[S]exual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people." (*Ashcroft v. Free Speech Coalition*

(2002) 535 U.S. 234, 244.) Accordingly, "great deference" is owed "to legislation designed to protect children, who all too frequently are helpless victims of sexual offenses." (*In re Wells* (1975) 46 Cal.App.3d 592, 599, superseded by statute on another ground as stated in *In re Palmer* (2021) 10 Cal.5th 959, 974-975.) *Gomez* upheld the same sentence Garcia challenges—15 years to life for oral copulation or sexual penetration of a child 10 years old or younger (*Gomez*, *supra*, 30 Cal.App.5th at p. 499); we find no basis for a different result here after considering Garcia's individual circumstances. (Accord *Baker*, *supra*, 20 Cal.App.5th at p. 720.) He has never admitted to, or demonstrated remorse for, his abuse of trust in forcing his niece to orally copulate him. Instead, he inexplicably maintains that none of his conduct was sexual in nature.

Such profound denial justifies a potential life term requiring defendants like Garcia to demonstrate rehabilitation to avoid serving the sentence to its end. "California has recognized, and reasonably so, that sex offenders present a serious danger to society because of their tendency to repeat their sexual offenses." (*People v. Meeks* (2004) 123 Cal.App.4th 695, 709 (*Meeks*).) Garcia's lack of insight creates a substantial risk he may reoffend. That risk is compounded by the veneer of respectability and stability he also invokes. Far from supporting his constitutional claim, that false picture created the opportunity for him to commit his crimes. That false aura should not be rewarded.

At the time of sentencing, J.L. remained in therapy. She was still traumatized by Garcia's grievous violations of her person and of a child's trust and vulnerability. "Sexual offenses . . . invade the deepest privacies of a human being, and thereby may cause permanent emotional scarring." (*Meeks*, *supra*, 123 Cal.App.4th at p. 709.) Incapacitation to prevent a perpetrator from reoffending, retribution, and deterrence are all valid penological goals that apply here, along with rehabilitation where there is the opportunity for parole. (*In re Nuñez* (2009) 173 Cal.App.4th 709, 730.) Weighed against these considerations, Garcia's punishment is not disproportionate to his offenses.

9

## DISPOSITION

The judgment is affirmed.


GOETHALS, J.

WE CONCUR:


MOORE, ACTING P. J.


ARONSON, J.