Filed 9/23/24  P. v. Ralls CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DEMARCUS RALLS,<br><br>    Defendant and Appellant. | A167413<br><br>(Alameda County<br>Super. Ct. No. 146000A) |

Demarcus Ralls appeals from the trial court's denial of his motion for an evidence preservation proceeding under Penal Code section 1203.01[1] on the authority of *People v. Franklin* (2016) 63 Cal.4th 261, 277 (*Franklin*) and *In re Cook* (2019) 7 Cal.5th 439 (*Cook*).

Ralls's prison term of life without the possibility of parole (LWOP) became final 15 years ago.  By his section 1203.01 motion, Ralls unsuccessfully argued that the California constitutional protection from cruel or unusual punishment requires an evidence preservation hearing in anticipation of any future effort to obtain a youthful offender parole hearing under section 3051.  He repeats this argument on appeal.

---

[1] Undesignated statutory references are to the Penal Code.

1

The People oppose Ralls's claimed entitlement to a section 1203.01 hearing on the merits, and also argue we lack jurisdiction to consider the issue in the absence of a habeas corpus petition. The People further argue that Ralls has forfeited his claim because he is in effect challenging his LWOP sentence, which has long been final.

Although we reject the People's jurisdictional and forfeiture arguments, we agree with them on the merits. We therefore affirm.

## I. BACKGROUND

### A. *Ralls's 2006 Conviction*

In 2006, Ralls was convicted of 25 violent crimes. These included multiple murders, committed in and around Oakland, California during an extended crime spree he engaged in, including with others as a member of a gang called the "Nutcases," in late 2002 and early 2003.

Specifically, as discussed in this Division's 2009 unpublished opinion, *People v. Ralls* (May 14, 2009, A115775) [nonpub. opn.],[2] Ralls was convicted of "three counts of first degree murder, one count of second degree murder, two counts of attempted murder, five counts of first degree robbery, six counts of second degree robbery, six counts of attempted robbery, and single counts of kidnapping and shooting at an inhabited dwelling. (§§ 187, subd. (a), 211, 246; former §§ 209, subd. (b)(1), 664.) The jury found true six arming allegations and 15 firearm use allegations. (Former §§ 12022, subd. (a)(1), 12022.5, subd. (a)(1), 12022.53, subds. (b)–(d).) . . . Two special circumstances were found to be true. (§§ 190.2, subd. (a)(3), (17)(A).)" (*Ibid.*)

---

[2] On our own motion, we take judicial notice of our 2009 opinion to discuss the background of this case. (Evid. Code, § 452, subds. (a), (d); Cal. Rules of Court, rule 8.1115(b).)

At sentencing, the court imposed four indeterminate terms in state prison—a term of LWOP, a term of 25 years to life, and two terms of seven years to life. (*People v. Ralls, supra,* A115775.) The court also sentenced Ralls to a determinate term of 141 years, four months. (*Ibid.*)

This Division affirmed the judgment against Ralls, except it ordered reversal of, and minor modifications to, sentences imposed for three first degree residential robbery convictions. (*People v. Ralls, supra,* A115775.) An abstract of judgment amended in September 2023 states Ralls's total sentence term to be an LWOP term for four murders, three to run concurrently to the fourth, and a determinate term of 178 years and 4 months.

**B. *Ralls's 2022 Franklin/Cook Motion To Preserve Evidence***

In April 2022, Ralls, representing himself, moved in superior court under section 1203.01, *Franklin,* and *Cook* for "an evidence preservation proceeding" "at which he will be permitted to make a record of mitigating evidence tied to his youth." In a bare-bones brief he filed in support of his motion, he argued he was entitled to preserve this evidence for later use in a youthful offender parole hearing under section 3051.

As we will discuss, the Legislature has amended section 3051 to provide such hearings for juvenile and young adult offenders *other than young adult LWOP offenders*, based on scientific evidence that neurological development, particularly in the areas of the brain relevant to judgment and decision-making, continues into a person's mid-20's. (§ 3051, subd. (h); *People v. Hardin* (2024) 15 Cal.5th 834, 845–846 (*Hardin*).) Ralls acknowledged that he was not statutorily entitled to such a hearing but contended in one sentence without citation to any legal authority or facts that it was cruel or

unusual punishment under our state Constitution to deny one to 18- to 25-year-old LWOP prisoners.[3]

The superior court denied Ralls's evidence preservation motion on a number of grounds, including, as pertinent here, because he "has not demonstrated, and cannot demonstrate, that a life sentence for multiple murders and robberies is 'so disproportionate . . . that it shocks the conscience and offends fundamental notions of human dignity.' (*People v. Avila* (2020) 57 Cal.App.5th 1134, 1145.)" (CT 46.)

Ralls filed a timely notice of appeal from the court's denial.

## II. DISCUSSION

Ralls, now represented by counsel, argues the trial court's denial of his motion for a proceeding to preserve evidence for use in a later youthful offender parole hearing violated his state constitutional protection against cruel or unusual punishment in light of his young age, 18, when he committed his crimes.

The People oppose Ralls's claim on the merits, but also argue we lack jurisdiction to consider Ralls's appeal because his motion was in effect a challenge to his LWOP sentence. Because Ralls can no longer challenge his conviction or sentence by direct appeal, the judgment against him having long ago become final, the People contend we have no jurisdiction to entertain this argument. They similarly contend Ralls has forfeited his claim by not objecting to his LWOP sentence when it was imposed in 2009.

We first address this jurisdiction/forfeiture issue.

---

[3] Ralls also argued, in an equally summary fashion, that his equal protection rights were violated by denying him a parole opportunity. He does not make this claim on appeal and, as we will discuss, a very similar one was recently rejected by the *Hardin* court, so we do not discuss it further.

## C. *Jurisdiction and Forfeiture*

### 1. Relevant Law

As the People point out, generally, "[f]or a defendant still in actual or constructive custody, a petition for writ of habeas corpus in the trial court is the preferred method by which to challenge circumstances or actions declared unconstitutional after the defendant's conviction became final." (*People v. Picklesimer* (2010) 48 Cal.4th 330, 339.)

But Ralls is appealing from a denial of a *Franklin/Cook* motion he brought under section 1203.01, which by its own terms permits the post-judgment filing of statements by the parties and the court for transmission to the California Department of Corrections and Rehabilitation (CDCR). Its purpose is to provide information to the CDCR in order to "assist effective administration of the law." (*Cook, supra*, 7 Cal.5th at p. 453.) In particular, the judge's statement, which the California Rules of Court states should be submitted no later than two weeks after sentencing, is intended to assist the CDCR's "programming and institutional assignment" and the "Board of Parole Hearings with reference to term fixing and parole release . . . ." (Cal. Rules of Court, rule 4.480.)

Specifically, section 1203.01, subdivision (a) provides that, "[i]mmediately after judgment has been pronounced," the attorney for the defendant, as well as the judge, district attorney, and law enforcement agency that investigated the case, may file "brief" statements regarding the person convicted and the crime committed.[4] The court clerk must send a copy of these statements to the CDCR facility where the defendant is imprisoned,

---

[4] If no probation officer's report has been filed, the judge and district attorney "shall cause" their statements to be filed. (§ 1203.01, subd. (a).)

5

as well as to the court, district attorney, law enforcement agency, the attorney for the defendant, and the defendant.[5]

Section 1203.01 does not require a defendant to state or prove he is entitled to use the statement he files for any particular purpose.[6] However, section 1203.01 by its own terms appears to contemplate this statement is to be filed shortly after the entry of judgment; the right to hold a section 1203.01 hearing years after a judgment has become final in order to preserve youth-related mitigating evidence for a future youthful offender hearing under section 3051 is established under *Franklin* and *Cook*.

In *Franklin*, our high court considered a cruel and unusual punishment challenge to a lengthy sentence, functionally equivalent to an LWOP, brought by the defendant, Franklin, a juvenile offender, on direct appeal from a judgment entered against him. (*Franklin, supra*, 63 Cal.4th at pp. 271–272.) The court held Franklin's challenge was moot in light of the Legislature's amendments to sections 3501 and 4801[7] to provide parole hearings for LWOP

---

[5] Also, section 1203.01, subdivision (b)(1) provides that "[i]n all cases in which the judgment imposed includes . . . an indeterminate term with . . . the possibility of parole," the clerk of the court is required to mail to the CDCR facility where the defendant is imprisoned copies of such documents as the charging documents and the transcript of the sentencing proceedings.

[6] For example, we see no reason why a defendant, even if not eligible for parole, could not file a statement under section 1203.01 in anticipation of seeking a recommendation from the Board of Parole Hearings to the Governor for a commutation of sentence or a pardon (see Cal. Const., art. V, § 8; § 4800 et seq.; § 4801, subd. (a); *People v. Beames* (2007) 40 Cal.4th 907, 931 [indicating Governor may commute an LWOP sentence].)

[7] As amended, beginning in 2014, section 4801 also provides that the Board of Parole Hearings, along with recommending pardons and commutations to the Governor and considering other matters, "shall", in reviewing a youthful offender's suitability for parole, "give great weight to the diminished culpability of youth as compared to adults, the hallmark features

6

juvenile offenders, at which hearings the offenders would be entitled to " 'a meaningful opportunity' " to obtain release. (*Franklin*, *supra*, 63 Cal.4th at pp. 276–280, quoting § 3051, subd. (e).) The court also held that Franklin was entitled to a hearing to preserve youth-related mitigating evidence in order to ensure this "meaningful opportunity" and in light of section 4801's requirement that the Board " 'give great weight to the diminished culpability of juveniles as compared to adults.' " (*Franklin*, at pp. 276–280, quoting §§ 3051, subd. (e), 4801, subd. (c).) In so holding, the court noted that this statutory language "echo[ed] language in constitutional decisions of the high court and this court." (*Id.* at pp. 282–284.)

*Cook* extended this right to a hearing to preserve evidence to a time long after a judgment has become final, relying on section 1203.01. The *Cook* court considered whether a juvenile offender, Cook, whose judgment had become final years before, was, consistent with *Franklin*, entitled to an evidence preservation hearing and whether he could move for one without bringing a habeas corpus petition. (*Cook*, *supra*, 7 Cal.5th at pp. 446–447.) The court answered both questions in the affirmative, relying on section 1203.01. (*Cook*, at pp. 446–455.)

The court concluded that section 1203.01's language specifying that statements by the judge and prosecutor be placed on the record " '[i]mmediately after judgment has been pronounced' " did not prohibit subsequent court action under the statute, concluding that "[t]here is no indication . . . that the statute's requirement deprives the court of authority to act at a later time." (*Cook*, *supra*, 7 Cal.5th at p. 453.) Further, the *Cook*

---

of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law." (§ 4801, subd. (c); Stats 2013, ch. 312, § 5; Stats 2017, ch. 684, § 2.5.)

7

court concluded, a juvenile offender could place information on the record under section 1203.01 based on a court's "inherent authority" under Code of Civil Procedure section 187 to authorize additional evidence preservation "[w]hen jurisdiction is, by the Constitution or this Code, or by any other statute, conferred on a Court or judicial officer." (*Cook*, at pp. 454–455 & fn. 4.)[8]

In holding that Cook did not need to file a habeas corpus petition, the court also emphasized that Cook, by his seeking to preserve evidence, was not seeking his release, nor was he challenging the jurisdiction of the trial court or the validity of the proceedings that led to his final judgment and sentence. (*Cook*, *supra*, 7 Cal.5th at p. 457.) It reasoned, "The relief he seeks is entirely consistent with section 1203.01, which has nothing to do with the validity of a trial court's judgment. The section does not define procedures that will culminate in a new judgment and does not contemplate modification of the original judgment. By its terms, the statute addresses the filing of statements with the court 'after judgment has been pronounced.' (§ 1203.01, subd. (a).) Further, the motion we recognize under section 1203.01 does not impose the rigorous pleading and proof requirements for habeas corpus. [Citation.] Nor does it require the court to act as a fact finder. Rather, it simply entails the receipt of evidence for the benefit of the Board. [Citation.] For these reasons, resort to the writ of habeas corpus in the first instance would be unnecessarily cumbersome. Not only is initial resort to Penal Code

---

[8] Code of Civil Procedure section 187 provides, "When jurisdiction is, by the Constitution or this Code, or by any other statute, conferred on a Court or judicial officer, all the means necessary to carry it into effect are also given; and in the exercise of this jurisdiction, if the course of proceeding be not specifically pointed out by this Code or the statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this Code."

8

section 1203.01, supplemented as necessary by Code of Civil Procedure section 187, an adequate remedy, it is superior in its efficiency and purpose to reliance on the great writ." (*Id*. at pp. 457–458.)

### 2. Analysis

Ralls, like Cook, invokes section 1203.01 many years after his conviction and sentence became final in order to preserve youth-related mitigating evidence for a future section 3051 youthful offender parole hearing, to which he claims he is entitled as part of his state constitutional protection from cruel or unusual punishment. Of course, unlike an equal protection theory that contends a young adult LWOP offender is entitled to the same statutory protection afforded to a juvenile LWOP offender,[9] Ralls's theory, however he states it, is that he is entitled to a section 3051-*style* hearing, since his protection from cruel or unusual punishment, if it applies here, would entitle him to such a hearing under our state Constitution, not section 3051. This constitutional rather than statutory entitlement is the only meaningful distinction between his theory and that embraced by the *Cook* court to permit a section 1203.01 hearing without the need to petition for a writ of habeas corpus.

The People argue this distinction is critical to the jurisdiction question because Ralls's evidence preservation motion is in effect a direct challenge to his long-final LWOP sentence, requiring that he bring a habeas corpus

---

[9] As we will discuss further, in *Hardin, supra*, 15 Cal.5th 834, our Supreme Court recently considered whether equal protection requires that a finally adjudged young adult offender be able to preserve evidence under section 1203.01 for a later section 3051 parole hearing. The court did not address any jurisdiction issue or indicate that the parties or lower courts raised the issue. Ralls nonetheless relies on *Hardin* to oppose the People's jurisdiction challenge, an argument we find unpersuasive because of the different nature of an equal protection challenge.

petition. Based on *Cook*, *Franklin*, and section 1203.01 itself, we conclude the People are relying on a distinction without difference.

As the *Cook* court noted, the statutory call of section 1203.01 "has nothing to do with the validity of a trial court's judgment. The section does not define procedures that will culminate in a new judgment and does not contemplate modification of the original judgment." (*Cook, supra*, 7 Cal.5th at p. 457.) Further, the *Cook* court held that any temporal requirements stated in section 1203.01 were not mandatory, and indicated the statute's scope was not limited to the filing of brief statements in light of the court's inherent authority under Code of Civil Procedure section 187 to establish additional evidence preservation procedures. (*Cook*, at pp. 457–458.) The *Cook* court also relied on the fact that a section 1203.01 hearing "does not impose the rigorous pleading and proof requirements for habeas corpus. [Citation.] Nor does it require the court to act as a fact finder. Rather, it simply entails the receipt of evidence for the benefit of the Board. [Citation.] For these reasons, resort to the writ of habeas corpus in the first instance would be unnecessarily cumbersome." (*Id*. at p. 457.)

Further, the *Franklin* court noted that the statutory references to "meaningful opportunity" and the "great weight" to be given to "diminished culpability" in sections 3051 and 4801 that the court relied on to conclude Franklin was entitled to an evidence preservation hearing "echo language in constitutional decisions" that we shall soon discuss (*Franklin, supra*, 63 Cal.4th at p. 283 [quoting *Miller v. Alabama* (2012) 567 U.S. 460, 477 (*Miller*); *Graham v. Florida* (2010) 560 U.S. 48, 75 (*Graham*); *Roper v. Simmons* (2005) 543 U.S. 551, 571 (*Roper*); and *People v. Caballero* (2012) 55 Cal.4th 262, 268, fn. 4 (*Caballero*)]). This further indicates we should

employ the same procedures for constitutionally-based challenges as for statutorily-based challenges.

Although the *Cook* and *Franklin* courts' discussions relate to a prisoner's *statutory* right to preserve evidence for a later youthful offender parole hearing, their reasoning applies equally to when a prisoner asserts a constitutional right to this same procedure—the statutory call of section 1203.01 remains the same, the *Cook* interpretation of that statute's scope and the import of Code of Civil Procedure section 187 is unaffected; the needlessness and cumbersome nature of requiring a habeas corpus petition to mandate an evidence preservation hearing remains just as true; and the importance of such a hearing to ensure a movant, should he or she be constitutionally entitled to a youthful offender parole hearing, has a meaningful opportunity for parole is unchanged. We therefore reject the People's threshold jurisdictional and forfeiture contentions, and turn to the merits of his cruel or unusual punishment claim.

## D. *The Merits of Ralls's Cruel or Unusual Punishment Claim*

### 1. Relevant Law

#### a. *Cruel or Unusual Punishment*

Article I, section 17 of the California Constitution prohibits the infliction of "[c]ruel or unusual punishment."[10] In evaluating whether a punishment is cruel or unusual, we determine whether a punishment " 'is so disproportionate to the crime for which it is inflicted that it shocks the

---

[10] The Eighth Amendment of the federal Constitution "prohibits cruel *and* unusual punishment. The distinction in wording between the federal and state Constitutions is substantive and not merely semantic." (*People v. Avila, supra,* 57 Cal.App.5th at p. 1145, fn. 13, citing *People v. Baker* (2018) 20 Cal.App.5th 711, 723.) Ralls relies exclusively on our state Constitution.

11

conscience and offends the fundamental notions of human dignity.' " (*People v. Dillon* (1983) 34 Cal.3d 441, 478 (plur. opn.) (*Dillon*).)

In determining whether a punishment shocks the conscience and offends fundamental notions of human dignity, we employ three analytical "techniques": "(1) an examination of the nature of the offense and the offender, with particular attention to the degree of danger both pose to society; (2) a comparison of the punishment with the punishment California imposes for more serious offenses; and (3) a comparison of the punishment with that prescribed in other jurisdictions for the same offense." (*In re Palmer* (2021) 10 Cal.5th 959, 973 (*Palmer*).) Whether a sentence is cruel or unusual punishment is a question of law subject to our independent review, but we view disputed facts in the light most favorable to the judgment. (*People v. Wilson* (2020) 56 Cal.App.5th 128, 166–167, following *In re Foss* (1974) 10 Cal.3d 910, 919–920; *In re Lynch* (1972) 8 Cal.3d 410, 425–428 (*Lynch*).)

"[T]he determination of whether a legislatively prescribed punishment is constitutionally excessive is not a duty which the courts eagerly assume or lightly discharge. Here, as in other contexts, ' "mere doubt does not afford sufficient reason for a judicial declaration of invalidity. Statutes must be upheld unless their unconstitutionality clearly, positively and unmistakably appears." ' " (*Lynch, supra*, 8 Cal.3d at pp. 414–415.) "Such an inquiry grants the Legislature considerable latitude in matching punishments to offenses. This latitude derives in part from the premise that a statute specifying punishment, like any other statute, is presumed valid unless its unconstitutionality ' " 'clearly, positively and unmistakably appears.' " ' [Citation.] But it also accounts for a very particular context, one in which '[t]he choice of fitting and proper penalties is not an exact science, but a

12

legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will; in appropriate cases, some leeway for experimentation may also be permissible.' [Citation.] A claim of excessive punishment must overcome a 'considerable burden' [citation], and courts should give ' "the broadest discretion possible" ' [citation] to the legislative judgment respecting appropriate punishment." (*Palmer, supra*, 10 Cal.5th at p. 972.) When a showing of cruel or unusual punishment is made, however, "we must forthrightly meet our responsibility 'to ensure that the promise of the Declaration of Rights is a reality to the individual.' " (*Lynch*, at p. 415.)

  b. *Developments in the Law*

  The United States Supreme Court has held that it is cruel and unusual punishment under the Eighth Amendment of the federal Constitution to sentence juvenile offenders to death for any offense (*Roper, supra*, 543 U.S. 551), to life without the possibility of parole for a nonhomicide offense (*Graham, supra*, 560 U.S. 48), and to a *mandatory* sentence of life without the possibility of parole for a homicide offense (*Miller, supra*, 567 U.S. 460; see also *Mongomery v. Louisiana* (2016) 577 U.S. 190 [holding *Miller* applied to juvenile offenders retroactively]). The high court based these decisions on youth-related mitigating factors that may diminish a juvenile's culpability and suggest a capacity for reform. (*Roper*, at pp. 569–573; *Graham*, at pp. 68, 71–74, 76; *Miller*, at pp. 471–480.)

  The Supreme Court has not applied these holdings to young adult offenders who committed their offenses when they were between the ages of 18 and 25, as is true of Ralls. It has explained, "Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have

13

already attained a level of maturity some adults will never reach.  For the reasons we have discussed, however, a line must be drawn. . . .  The age of 18 is the point where society draws the line for many purposes between childhood and adulthood.  It is, we conclude, the age at which the line for death eligibility ought to rest." (*Roper*, *supra*, 543 U.S. at p. 574.)

In 2012, our Supreme Court relied on *Roper*, *Graham* and *Miller*, particularly their concerns about youth-related mitigating factors, to hold that "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment." (*Caballero*, *supra*, 55 Cal.4th at p. 268.)

Our high court has consistently held that it is *not* cruel and unusual punishment under the Eighth Amendment to impose the death penalty for persons who committed their offenses between the ages of 18 and 21, however.  (*People v. Flores* (2020) 9 Cal.5th 371, 429.)  The court has rejected the argument that the Eighth Amendment barred this ultimate punishment because "research shows . . . young adults suffer from many of the same cognitive and developmental deficiencies as adolescents." (*Flores,* at p. 429.)  The court, noting that it had rejected similar arguments in the past, such as in *People v. Powell* (2018) 6 Cal.5th 136, 191 and *People v. Gamache* (2010) 48 Cal.4th 347, 405, relied on *Roper*'s conclusion that, while " ' "qualities that distinguish juveniles from adults do not disappear when an individual turns 18," ' " "the ' "age of 18 is the point where society draws the line for many purposes between childhood and adulthood" ' and is ' "the age at which the line for death eligibility ought to rest." ' " (*Flores*, at p. 429, quoting *People v. Powell*, at pp. 191, 192, quoting *Roper*, *supra*, 543 U.S. at p. 574.)

14

More recently, our Supreme Court also rejected a virtually identical argument that imposing the death penalty on young adult offenders between the ages of 18 to 20 years old constituted cruel and unusual punishment under the state and federal Constitutions, declining to revisit its prior rulings. (*People v. Tran* (2022) 13 Cal.5th 1169, 1234–1235 (*Tran*).) Noting that the appellant had pointed to various developments in the study of young adult behavior in the previous few years, the court, quoting *Flores,* concluded that they did not establish the " ' "national consensus" ' " necessary to justify a categorical bar on the death penalty for young adults between the ages of 18 and 21, and that the appellant did not present much in the way of new scientific evidence that might be relevant to the issue. (*Tran*, at p. 1235, quoting *Flores*, *supra*, 9 Cal.5th at p. 429.)

In 2014, our Legislature enacted Penal Code section 3051 to bring juvenile sentencing into conformity with *Graham*, *Miller*, and *Caballero*. (*Franklin*, *supra*, 63 Cal.4th at p. 277.) The heart of section 3051, as originally enacted, required the Board of Parole Hearings to conduct a youth offender parole hearing during the 15th, 20th, or 25th year of a juvenile offender's incarceration in order to consider youth-related mitigating factors. (*Franklin*, *supra*, 63 Cal.4th at p. 277.) The Legislature stated in the opening provision of the legislation, " 'The Legislature recognizes that youthfulness both lessens a juvenile's moral culpability and enhances the prospect that, as a youth matures into an adult and neurological development occurs, these individuals can become contributing members of society. The purpose of this act is to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity, in accordance with [*Cabellero*,

*Graham*, and *Miller*.] . . . It is the intent of the Legislature to create a process by which growth and maturity of youthful offenders can be assessed and a meaningful opportunity for release established.' " (Stats. 2013, ch. 312, § 1; *Hardin*, *supra*, 15 Cal.5th at p. 880.)

Since enacting section 3051, and upon consideration of scientific evidence that neurological development continues into a person's mid-20's, the Legislature has amended section 3051 to provide youth offender hearings for juvenile *and* young adult offenders up to the age of 25, *with the exception of young adult LWOP offenders*. (*Hardin*, *supra*, 15 Cal.5th at pp. 845–846; § 3051, subd. (h) ["This section shall not apply . . . to cases in which an individual is sentenced to life in prison without the possibility of parole for a controlling offense that was committed after the person had attained 18 years of age."].)

At a youth offender parole hearing under section 3051, the Board of Parole Hearings must consider any evidence of youth-related mitigating factors that might apply to the offender. As we have discussed, in order to ensure this occurs in a meaningful way, a youth offender may move post-final judgment for a proceeding under section 1203.01 to preserve evidence of youth-related factors, as established in *Franklin*, *supra*, 63 Cal.4th 261 and *Cook*, *supra*, 7 Cal.5th 439.

Until recently, challenges by LWOP prisoners sentenced as young adults to denials of parole- or resentencing-related requests made under laws applicable to juveniles have tended to focus on prisoners' constitutional rights to equal protection vis-à-vis juveniles. For example, in *In re Jones* (2019) 42 Cal.App.5th 477, this Division rejected an equal protection challenge to the denial of a section 1170 resentencing petition. The court held that the difference in maturity between juveniles and a 19-year-old was a sufficient

16

reason for the Legislature to distinguish between them. Among other things, the court quoted approvingly *Roper*'s holding that a line could be drawn at age 18. (*In re Jones*, at pp. 482–483.)

In March of this year, our Supreme Court, in *Hardin, supra*, 15 Cal.5th 834, rejected an equal protection challenge to the denial of a youth offender parole hearing to defendant Hardin, who was serving an LWOP sentence for a special circumstance murder he committed when he was 25 years old. The court held that the Legislature could rationally balance the seriousness of an offender's crimes against the capacity of young adults for growth and determine that young adults who have committed certain very serious crimes, such as special circumstance murder, should remain ineligible for release from prison. (*Id*. at p. 839.)

Our high court followed *Hardin* with *People v. Williams* (August 29, 2024, S262229) __ Cal.5th __ [2024 Cal. Lexis 4811]. In *Williams*, the court held that the Legislature did not violate the equal protection guarantee in the federal Constitution by excluding, in section 3051, subdivision (h), so-called "One Strike" young adult sex offenders (defendant Jeremiah Williams was 24 years old when he committed his One Strike offenses) from the youthful parole hearing process because the Legislature had a rational basis for doing so.

In the Courts of Appeal, we have only found rejections of Eighth Amendment cruel and unusual punishment challenges to young adult LWOP sentences for murders that were based on contentions of limited cognition or maturity. (See *People v. Montelongo* (2020) 55 Cal.App.5th 1016, 1021, 1030–1032 [affirming an LWOP sentence imposed for a special circumstance murder committed by an 18-year-old]; *People v. Acosta* (2021) 60 Cal.App.5th 769, 772, 781 [affirming three consecutive LWOP sentences imposed for

17

special circumstance murders committed by a 21-year-old with autism spectrum disorder]; see also *People v. Abundio* (2013) 221 Cal.App.4th 1211, 1217–1220 [affirming an LWOP sentence for a special circumstance murder committed at age 18, following *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482]; *People v. Perez* (2016) 3 Cal.App.5th 612, 614–618 [affirming 86-year-to-life sentence for attempted premeditated murders and other crimes, also following *Argeta*].)

A panel in this Division rejected a young adult offender's cruel and unusual punishment challenge to lengthy sentences for violent crimes in *People v. Edwards* (2019) 34 Cal.App.5th 183, 190 (*Edwards*), disapproved of on other grounds in *People v. Williams, supra*, __ Cal.5th at p. __, fn. 12 [2024 Cal. Lexis at p. *58, fn. 12]. There, two defendants were sentenced to 129 years to life and 95 years to life for their commission of sexual assault crimes and two robberies when they were 19 years old. (*Edwards*, at p. 186.) On appeal, they argued their sentences violated federal and state constitutional prohibitions against cruel and unusual punishment by not taking into account their " 'extreme youth' " at the time of the offenses, arguing that none of the youth-related mitigating characteristics discussed in *Graham*, *Roper*, *Miller*, and *Caballero* " 'end abruptly on one's 18th birthday.' " (*Id.* at p. 190.) The court rejected that argument, noting those cases drew "a bright line" at age 18 and that defendants' crimes were "egregious." (*Id.* at pp. 190–192.) It concluded that, under the circumstances, "we find no principled basis for concluding that these sentences, though each amounts to a term of life in prison, fall outside the range where a reviewing court must defer to legislative judgments on criminal sentencing." (*Id.* at p. 192.)

18

## 2. Analysis

Ralls concentrates his state constitutional cruel or unusual punishment claim on an argument under the first *Lynch* "technique" (*Lynch, supra,* 8 Cal.3d at pp. 426-427) —"(1) an examination of the nature of the offense and the offender, with particular attention to the degree of danger both pose to society" (*Palmer, supra,* 10 Cal.5th at p. 973).  He argues a mandatory LWOP for young adults is too severe a penalty in light of the emerging scientific evidence that young adults' brains are not fully developed, their culpability is diminished and they are more capable of rehabilitation than older adults; young adults exhibit recklessness, impulsivity, and risk-taking; young adults are vulnerable to negative influences; and young adults are more capable of change than older adults.

In support of these contentions, Ralls primarily relies on extensive citations to and quotes from more than four dozen non-legal articles and studies.  He identifies these as coming from such publications as "Dev Psychol," "J Neuroscience," "Psychol Sci" and the like, *none* of which were presented to the court below, are contained in the appellate record, or are the subject of a request for judicial notice.

We cannot consider these articles and studies.  " 'It is elementary that the function of an appellate court, in reviewing a trial court judgment on direct appeal, is limited to a consideration of matters contained in the record of trial proceedings, and that "Matters not presented by the record cannot be considered on the suggestion of counsel in the briefs." ' " (*People v. Mills* (1978) 81 Cal.App.3d 171, 175, quoting *People v. Merriam (*1967) 66 Cal.2d 390, 396–397; see also *In re Rogers* (1980) 28 Cal.3d 429, 437, fn. 6 [also quoting *Merriam*].)  Also, even if these articles and studies were in the record of appeal and Ralls requested that we take judicial notice of them,  we would not do so.  (*Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 325–326 ["An

19

appellate court may properly decline to take judicial notice under Evidence Code sections 452 and 459 of a matter which should have been presented to the trial court for its consideration in the first instance"]; *People v. Jacinto* (2010) 49 Cal.4th 263, 272, fn. 5 [" '[A]n appellate court generally is not the forum in which to develop an additional factual record' "].)

To be sure, our Supreme Court has instructed that "[a] request for judicial notice of published material is unnecessary" and that "[c]itation to the material is sufficient." (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 45, fn. 9.) But it gave this instruction in the context of a request for judicial notice of legislative history materials (*ibid.*; see also *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1129, fn. 4; *Sharon S. v. Superior Court* (2003) 31 Cal.4th 417, 440, fn. 18), which, as precursors to the "statutory law of any state" (Evid. Code § 452, subd. (a)), may be judicially noticed on the same basis as statutes or regulations. The non-legal articles and studies cited by Green are not such materials.

Our determination that the articles and studies proffered by Ralls cannot be considered fatally undermines his cruel or unusual punishment argument. While we always carefully consider a contention that a particular punishment is cruel or unusual under our state Constitution (*Lynch*, *supra*, 8 Cal.3d at p. 414), we are mindful here that Ralls bears a " 'considerable' " burden in his effort to establish such a claim (*Palmer*, *supra*, 10 Cal.5th at p. 972). To meet that burden, Ralls, like any appellant seeking to overcome the presumption of correctness, must not only ground his legal arguments in

competent and compelling evidence, but that evidence must have been presented to the trial court.  He fails to do so here in both respects.[11]

The lack of competent evidence to support Ralls's constitutional claim is dispositive, particularly because the first *Lynch* "technique" calls for a fact-intensive inquiry that focuses on the crime and the particular person before the court (*Dillon*, *supra*, 34 Cal.3d at p. 479 (plur. opn.)).  Ralls's crimes were far from ordinary, even for a special circumstance murder.  He was convicted of dozens of crimes that he committed during an extensive crime spree that lasted weeks, and which included the first degree murder of several people.  Also, Ralls does not make any significant contentions regarding the second and third techniques of our proportionality analysis.  Based on the spare record before us and Ralls's extraordinarily egregious conduct, we are unpersuaded that his LWOP sentence was so disproportionate to his particular criminality " 'that it shocks the conscience and offends the fundamental notions of human dignity.' " (*Dillon*, at p. 478 (plur. opn.).)

In the absence of competent evidence, the support for Ralls's claim comes down to two legal arguments, neither of which is persuasive.

First, Ralls argues, as appellants have previously contended in other cases, that the youth-related mitigating factors discussed in cases such as *Graham*, *Miller*, and *Roper*, and cited by our Legislature in adopting section 3051, apply equally to him, given that he was only 18 when he committed the

---

[11] In addition to his contention under the first *Lynch* "technique" that society's evolving standards of decency indicate his LWOP sentence is too severe, Ralls points to various recent criminal justice reforms around the country and in California.  None of these reforms involves treatment of LWOP offenders or the kinds of offenses that, in California, warrant the imposition of LWOP sentences.  For example, he points to the revision of laws such as those prohibiting a person under 21 from purchasing alcohol or cigarettes.  This is hardly compelling evidence.

subject crimes.  As we have discussed, this argument has been repeatedly rejected by the United States Supreme Court, our high court, and other California appellate panels (among them one of our own in Division Four of the First District) in favor of the "bright line" rule that courts may constitutionally impose the most severe sentences, including LWOP and death sentences, on young adults.  If there is to be a new path in the law, departing from settled precedent on this point, we are not empowered as an intermediate appellate court to chart it.

Second, Ralls relies on three recent opinions issued by the high courts of Washington, Michigan, and Massachusetts that *did* hold certain LWOP sentences imposed on young adult offenders to be cruel and unusual punishment.  (See *Commonwealth v. Mattis* (2024) 493 Mass. 216, 219 [224 N.E.3d 410, 416] [LWOP sentence for 18- to 20-year-olds violated state constitutional "cruel or unusual punishment" protections] (*Mattis*); *People v. Parks* (2022) 510 Mich. 225 [987 N.W.2d 161] [mandatory LWOP sentence for 18-year-olds without consideration of individualized circumstances, such as the mitigating circumstances of youth, that courts were statutorily required to consider for juvenile offenders violated the state constitutional "cruel or unusual punishment" provision] (*Parks*); and *In re Pers. Restraint of Monschke* (2021) 197 Wn.2d 305 [482 P.3d 276] [based largely on scientific research and case law regarding juveniles, holding that LWOP sentences for 19- and 20-year-olds imposed without an individualized inquiry into the mitigating qualities of youth was "cruel punishment" under Washington's Constitution] (*Monschke*).)

Ralls points out that two of our Supreme Court justices cited these cases favorably in a recent dissent from the denial of a petition for review.  Earlier this year, our colleagues in Division Five affirmed the denial of a

*Franklin*/*Cook* motion in an appeal brought by an LWOP prisoner who committed violent crimes, including a special circumstance first degree murder, when he was 18. (*People v. Powell* (Feb. 23, 2024, A167066) [nonpub. opn.], review den. June 12, 2024, S284418 (stmt. of Evans, J.).) Our Supreme Court declined to review this case, and the denial was accompanied by a lengthy dissent written by Justice Evans, in which Justice Liu concurred. Justices Evans and Liu would have granted review to consider whether the denial of the prisoner's motion constituted cruel or unusual punishment under the California Constitution, including but not limited to because of the disproportionate impact of such a denial on young African Americans. (*People v. Powell*, *supra*, A167066, review den. June 12, 2024, S284418 (stmt. of Evans, J.).) Among other things, they found the analyses in *Mattis*, *Parks*, and *Monschke* to be "compelling." (*Ibid*.) Perhaps the calls made by Justices Evans and Liu in *Powell* will be heeded by their colleagues at some point, but it is above our pay grade to do so.

In the meantime, all we can say is that opinions from other jurisdictions are not binding on our courts, although they "may provide useful analytical approaches." (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 762.) Here, the three opinions cited by Ralls do not appear to be particularly useful in light of his focus on the first, fact-intensive technique of our proportionality analysis. These other courts considered significant scientific evidence (*Mattis*, *supra*, 224 N.E.3d at pp. 416–418 [trial court heard extensive expert neuroscientist and psychologist testimony and made factual findings]; *Parks*, *supra*, 987 N.W.2d at pp. 171, 173–176 [referring to and extensively reviewing "the scientific research submitted by amici and defense counsel"]; *Monschke, supra*, 482 P.3d at pp. 285–286 [discussing, along with studies cited in a prior case and by the People, "more

23

recent studies" that the parties "bring . . . to our attention"], whereas such evidence is almost entirely lacking in the record before us here. And to the extent that Ralls intends by his citations to these cases to address the third technique, "a comparison of the punishment with that prescribed in other jurisdictions for the same offense" (*Palmer, supra,* 10 Cal.5th at p. 973), he presents competent evidence here suggesting that the California courts should join what an emerging " ' "national consensus" ' " (*Tran, supra,* 13 Cal.5th at p. 1235).

In short, we conclude Ralls's cruel or unusual punishment claim lacks merit. We do not mean to suggest we would reach this same conclusion for all LWOP sentences imposed on young adult offenders, but simply that Ralls has not established his sentence was cruel or unusual punishment in the particular circumstances of his case.

## III. DISPOSITION

The order appealed from is affirmed.

STREETER, J.

WE CONCUR:

BROWN, P. J.
DOUGLAS, J.*

---

\* Judge of the Superior Court of California, County of Contra Costa, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

24