Filed 4/3/25  P. v. Mendoza CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE


| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>JOEY ALFRED MENDOZA,<br><br>  Defendant and Appellant. | B335080<br><br>(Los Angeles County Super. Ct. No. NA105142) |


APPEAL from a judgment of the Superior Court of Los Angeles County, Laura Laesecke, Judge.  Affirmed as modified.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, and Stephanie A. Miyoshi, Deputy Attorney General, for Plaintiff and Respondent.

A jury convicted defendant Joey Alfred Mendoza (defendant) of the murders of Louis Garcia (Garcia) and Charalambos "Bob" Antonelos (Antonelos).  The trial court sentenced him to life in prison without the possibility of parole (LWOP).  We consider whether reversal of defendant's murder convictions is required because gang evidence was admitted at trial even though gang sentencing allegations were not charged.  We also resolve several challenges to defendant's sentence, some of which were not raised below, and we review in camera records concerning the defense's pre-trial request for any *Brady v. Maryland* (1963) 373 U.S. 83 information concerning two investigating detectives.

## I.  BACKGROUND

### A.  *The Initial Confrontation Between Defendant and Garcia that Led to the Shooting*

In the morning on October 9, 2016, victim Garcia parked near an El Pollo Loco restaurant located in the Harbor City neighborhood of Los Angeles.  The restaurant was situated near a number of other businesses lining a triangular plaza; those other enterprises included a hamburger restaurant, a small grocery store, and a smoke shop.  The shopping plaza fell within the territory claimed by the Harbor City Boys, a criminal street gang, and certain buildings surrounding the plaza were "tagged" with graffiti associated with that gang.

When Garcia parked at the shopping plaza on the day in question, he was wearing a hat emblazoned with a red "W," which was apparel associated with the East Side Wilmas, a criminal street gang that is a rival of the Harbor City Boys.  He entered the El Pollo Loco, where his girlfriend Cynthia Renteria

(Renteria) worked, and began arguing with her.  After other people intervened and succeeded in calming him down, Garcia left.

Two hours later, however, Garcia returned to the plaza and yelled at Renteria through the El Pollo Loco drive-through window.  At that point, defendant, who had been loitering with others outside the plaza's smoke shop, approached Garcia's vehicle.  Defendant was 18 years old at the time, and he had a tattoo on his lower right arm and hand associated with the Harbor City Boys.  Defendant confronted Garcia, an argument ensued, and after a few minutes, defendant fled on foot and Garcia gave chase.

Defendant ran inside the smoke shop, followed by Garcia.  As defendant hid in a back room, Garcia yelled and made "lots of threats."  Garcia left after a shop employee who recognized him told him to leave.  The same employee also recognized defendant because defendant was often in the plaza in the company of other men.

The next day, defendant walked up to the El Pollo Loco drive-through window where Renteria was working.  Defendant pushed open the window and told her, "Tell your homeboy to come through.  I have something for him."

### B.    The Murders

Two days later, on October 12, 2016, Garcia was back at the shopping plaza smoking marijuana and chatting with a homeless man.  Defendant, wearing an orange vest and blue pants, entered the smoke shop looking to purchase a bandana.  After failing to find a bandana, defendant went to the nearby

3

market. During a ten-minute period,[1] defendant, still wearing an orange vest and blue pants, walked through the market several times. The cashier on duty that morning recognized defendant because he was a regular customer of the store and because she knew the grandmother of his girlfriend. On his last trip through the market that morning, defendant had changed his attire: he was wearing a dark hoodie sweatshirt with the hood up and a rag or a t-shirt wrapped around his lower face.

Defendant then walked toward the hamburger restaurant and found Garcia inside. Defendant shot Garcia in the back multiple times without saying anything—killing him—and then exited the restaurant through its back door.[2] Defendant's gunfire also hit Antonelos, the hamburger restaurant's owner, killing him too.

### C. Police Investigation

The day after the shootings, detectives from the Los Angeles Police Department (LAPD) interviewed Edwin Ortiz, a childhood friend of defendant's. Ortiz said that, on the day of the shooting, defendant admitted he "got him"—meaning "the fool" from the East Wilmas who had "chased [him] through the plaza." Defendant also told Ortiz that he "got two people, like two people got hit," but appeared shocked when Ortiz revealed the second

---

[1]     Defendant's presence in the market was captured by video surveillance cameras.

[2]     Garcia suffered five gunshot wounds, including a penetrating wound that entered his left shoulder and then his neck before exiting the top of Garcia's head.

4

victim was Antonelos. Ortiz also told the detectives that defendant was a member of the Harbor City Boys.

Later that same day, law enforcement officers arrested defendant. He was interviewed by LAPD detectives and denied any involvement in the shootings. After the interview, however, defendant was placed in a cell with an undercover officer posing as an inmate.

During the conversation with the undercover officer that ensued, which was audio recorded, defendant described himself as a "Harbor City[ ] homie"[3] and described Garcia as an "eastside shit" who had been "bothering [defendant] for about three days." Defendant said that when he saw Garcia at the hamburger restaurant, he "hit that motherfucker. That quick. . . . [¶] . . . [¶] I lit that fucker. . . . [¶] . . . [¶] I just fucken blasted this fool. . . . [¶] . . . [¶] I hit that fool's neck. . . . And before he was down, . . . his neck was already, like, detached from his face." Defendant also confessed to shooting Antonelos: "Then after [shooting Garcia], Bob came up. That was stupid. He tried to get people out. . . . [¶] . . . [¶] [So,] Bob got it too. I take over the scene and shit."

D.    *Criminal Proceedings, Including the Gang Evidence at Trial*

The Los Angeles County District Attorney charged defendant with murdering Antonelos (count 1) and Garcia (count 2). Attached to each murder charge were gang sentencing

---

[3]    Defendant later told the undercover officer that although he had not yet been officially "jumped in" to the Harbor City Boys, he had "t[aken] out homies."

allegations (Pen. Code,[4] §§ 186.22, subds. (b)(1)(C) & (b)(5), 190.2, subd.(a)(22)), multiple murder special circumstance allegations (§ 190.2, subd.(a)(3)), and firearm enhancement allegations (§ 12022.53, subds. (b)-(d)).

Just before the start of defendant's trial in June 2023, the prosecution advised the trial court that it was not going to pursue the gang enhancement or gang special circumstance allegations. But the prosecution asked the court to still permit introduction of some gang evidence at trial. The defense objected that such evidence was not relevant if the prosecution was not proceeding on the gang allegations. The court overruled the defendant's objection and found certain gang-related evidence, e.g., testimony about the crime scene's location in gang territory, was admissible because it was relevant to motive.

During trial, the prosecution called LAPD officer Victor Sosa to testify as a gang expert. At the time of the shootings, Officer Sosa was assigned to monitor the Harbor City Boys and he had had multiple contacts with defendant prior to his arrest for the two charged homicides.

During his testimony, Officer Sosa described the territory claimed by the Harbor City Boys and the gang's history, size, rivals, signs, apparel, and tattoos. Officer Sosa opined that defendant was a member of the Harbor City Boys at the time of the murders. He also explained that tattoos were a way for a member to show loyalty to the gang, and he informed the jury that defendant added larger and more visible Harbor City Boys tattoos to his face and body following his arrest.

---

[4]     Undesignated statutory references that follow are to the Penal Code.

6

Officer Sosa also testified generally that territory was "100 percent important" to a gang and its members would protect the gang's territory "at all times" and "do whatever it takes to protect it." In addition, he explained that respect was a "big thing. If you're a gang member, you're active and you get disrespected, other gang members hear about it, especially within their gang, that is weakness. Within a gang you don't show weakness." Consequently, Officer Sosa explained, if a rival enters a gang's territory, it was incumbent on the gang's members to defend their territory by sending a message to the rival gang: if you come into our territory, "either you're going to get severely beaten or you're going to get killed."

During closing argument, the prosecution maintained the gang evidence was "important because the gang threat . . . is interwoven through every act, through every contact. It is the reason why the defendant took these measures to do what he did." The prosecutor argued that after being chased by Garcia into the smoke shop, defendant had to send a message both to his gang and to the East Side Wilmas: "To have a face-to-face challenge like that, a confrontation on your home territory[,] and back down, that can't happen, especially if [the person you backed down from is] wearing a rival gang[']s colors representing the W for Wilmas. [¶] This is a big issue. . . . [¶] . . . [¶] He can't let this sit. He just got chased in public, in broad daylight. He got chased on his own home territory back into the smoke shop." The prosecution also argued defendant intentionally killed Antonelos: "When Bob got shot, the defendant knew exactly what he was doing. Bob got in the way. [Defendant] was taking over, and that's why Bob died."

7

*E.    Conviction and Sentencing*

The jury found defendant guilty of the first degree murder of Garcia and the second degree murder of Antonelos.  In addition, the jury found true the multiple murder special circumstance and firearm enhancement allegations for each murder.

In advance of sentencing, the defense submitted a memorandum urging the trial court to stay the sentence for the murder of Antonelos, stay all sentencing enhancements, and impose only a sentence of 25 years to life for the murder of Garcia.  The defense argued this was justified in light of defendant's lack of a prior criminal record, relative youth at the time of crime, and asserted mental illness.[5]  The prosecution recommended an LWOP sentence.

The trial court sentenced defendant to LWOP plus 90 years to life in prison.  The court calculated this sentence as 50 years to life for the murder of Garcia (25 years to life for the murder plus another 25 years to life for the section 12022.53, subdivision (d) firearm enhancement); 40 years to life for the murder of Antonelos (15 years to life for the murder plus 25 years to life for the section 12022.53, subdivision (d) firearm enhancement); and LWOP for the multiple murder special circumstance findings. The court elected to run the murder sentences consecutively

---

[5]    In support of its sentencing memorandum, the defense submitted a report by a forensic psychiatrist who evaluated defendant.  The defense psychiatrist opined defendant suffered from Cannabis and Alcohol Use Disorders, Separation Anxiety, and Unspecified Anxiety Disorder as the result of various prior traumatic events.

8

because Antonelos did not simply die "in the course of the shooting;" defendant "chose to kill" him.

In explaining its sentencing decision, the court stated: "It doesn't make me happy to impose this type of sentence, and given that you're a youthful offender, you will have at some point a parole hearing[.] [B]ut I am sentencing you this way because I believe you are a danger to the community and you have a mentality of someone who is willing to kill, and you deserve to stay in prison, in my opinion; so that's why I'm choosing, knowing I have the discretion to choose otherwise."

## II.  DISCUSSION

Defendant's two challenges to his convictions are meritless. The gang evidence admitted at trial was relevant to motive and intent, and the defense never argued below, and cannot argue now, that the evidence should be excluded on Evidence Code section 352 grounds.  Moreover, even assuming just for argument's sake that there was evidentiary error, the error was obviously harmless—the evidence against defendant (including devastating recorded admissions) is overwhelming.  Separately, we have reviewed the in camera proceedings held in connection with the defense pre-trial request for *Brady* information and hold the trial court's ruling that no information needed to be produced to the defense was not an abuse of discretion.  (See generally *People v. Superior Court (Johnson)* (2015) 61 Cal.4th 696, 712-715; *People v. Mooc* (2001) 26 Cal.4th 1216, 1228 [*Pitchess v. Superior Court* (1974) 11 Cal.3d 531 rulings are reviewed for abuse of discretion].)

Defendant's challenges to the sentence he received are also unavailing in the main.  His contention that his LWOP sentence

constitutes cruel or unusual punishment is forfeited because it was not raised in the trial court. The trial court did not abuse its discretion in declining to strike the firearm enhancements because it reasonably concluded imposition of the enhancements was appropriate to protect the public from the danger posed by defendant. And the court's remark at sentencing about the availability of a youth offender parole hearing did not influence the sentence imposed. There were, however, some technical errors made at the sentencing hearing and in memorializing defendant's sentence. Because the trial court imposed the maximum possible sentence, we can fix the problems ourselves.

### A.     The Trial Court Did Not Err in Admitting the Gang Evidence and There Was No Prejudice In Any Event

Under established Supreme Court precedent, "evidence of gang membership is often relevant to, and admissible regarding, the charged offense" because "evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like . . . can help prove identity, motive, modus operandi, specific intent . . . or other issues pertinent to guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049; *see also People v. Montes* (2014) 58 Cal.4th 809, 859 ["While gang membership evidence does create a risk the jury will impermissibly infer a defendant has a criminal disposition and is therefore guilty of the offense charged [citation], 'nothing bars evidence of gang affiliation that is directly relevant to a material issue'"].) Our Supreme Court has also "held that gang evidence, even if not admitted to prove a gang enhancement, may still be relevant and admissible to prove other facts related to a crime." (*People v. Tran* (2022) 13 Cal.5th

1169, 1208.) Appellate review of a trial court's admission of gang evidence under such circumstances is for abuse of discretion. (*People v. Chhoun* (2021) 11 Cal.5th 1, 31.)

There was no such abuse here. Evidence of defendant's membership in the Harbor City Boys (including his tattoos both before and after his arrest), of the territory claimed by the Harbor City Boys, of the potential significance of Garcia wearing a hat with an emblem associated with a rival gang while in an area marked as Harbor City Boys territory, and of the adverse consequences that would befall a gang member if he allowed a rival to move openly through his gang's territory and fled without reprisal from a confrontation were relevant to establishing defendant's motive and intent to kill Garcia. (See, e.g., *People v. Duong* (2020) 10 Cal.5th 36, 64 [trial court did not prejudicially err in admitting gang evidence where "there was little question that evidence of defendant's gang membership was relevant to motive" and "gang affiliation evidence gave context to the shooting"]; *People v. McKinnon* (2011) 52 Cal.4th 610, 655 [gang evidence was relevant to "establish defendant's motive and intent for simply walking up to" the victim and shooting him]; see also *Chhoun*, *supra*, 11 Cal.5th at 32 ["""[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence"""].)

Defendant nonetheless argues the gang evidence should have been excluded pursuant to Evidence Code section 352 as more prejudicial than probative.[6] Defendant concedes, however,

---

[6]   Evidence Code section 352 provides "The court in its discretion may exclude evidence if its probative value is

11

that there was no contemporaneous Evidence Code section 352 objection to admission of the evidence in the trial court. That means the argument is forfeited. (See, e.g., *People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 773; *People v. Partida* (2005) 37 Cal.4th 428, 431 [a defendant may not argue on appeal that the court should have excluded evidence for a reason not asserted at trial].)

Defendant responds that he still merits relief because the failure to raise an Evidence Code section 352 objection constitutes ineffective assistance of counsel. That claim fails because the appellate record is silent as to why there was no objection and we can readily hypothesize satisfactory explanations for the absence of an objection (e.g., to avoid drawing further attention to the gang evidence). (*People v. Carter* (2005) 36 Cal.4th 1114, 1189 [a defendant has the burden to establish constitutionally inadequate assistance of counsel and if the record on direct appeal does not reveal why counsel did not object, a reviewing court must reject an ineffective assistance of counsel claim "'unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation'"].)

Furthermore, even assuming *arguendo* that there was evidentiary error or ineffective assistance of counsel on this point, there is still no prejudice to defendant on this record. (Cal. Const., art. VI, § 13; Evid. Code., § 353, subd. (b); *People v. Ng*

---

substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

(2022) 13 Cal.5th 448, 522-523.) We have no doubt—in view of defendant's several admissions to committing the murders, the strong eyewitness testimony, and the other forensic evidence— that the jury would have reached the same verdicts if no gang evidence had been admitted at trial.

### B. *The Trial Court's* Brady *Discovery Ruling Was Not Error*

In May 2023, shortly before trial, defendant filed a *Johnson, supra*, 61 Cal.4th 696 motion to obtain any *Brady* information that may be included in the personnel files of two LAPD detectives. The trial court thereafter conducted an in camera review of information made available by an LAPD custodian and ordered no information needed to be disclosed to defendant.

Defendant, without opposition, requests we review the in camera proceedings to determine if there was any error. We have reviewed the sealed transcript of the in camera hearing and hold the trial court's determination that no materials should be produced to the defense was not an abuse of discretion.

### C. *Defendant's Cruel or Unusual Punishment Challenge to His Sentence Is Forfeited*

Defendant argues his sentence qualifies as cruel or unusual punishment under article I, section 17 of the California Constitution because he was 18 years old at the time of the double murder. Quoting extensively from a dissenting statement issued by Justice Evans respecting the denial of a petition for review, defendant embellishes the argument by asserting his sentence is cruel or unusual "when considered under current

13

societal norms and objectives, as reflected by the Legislature's enactment of the Racial Justice Act."[7]

The cruel or unusual punishment arguments defendant makes now were never raised in the trial court. They are accordingly forfeited. (See, e.g., *People v. Salazar* (2016) 63 Cal.4th 214, 239-240 ["'[A]s a general rule, "the failure to object to errors committed at trial relieves the reviewing court of the obligation to consider those errors on appeal." [Citations.] This applies to claims based on statutory violations, as well as claims based on violations of fundamental constitutional rights"']; *People v. French* (2008) 43 Cal.4th 36, 46; *People v. Brewer* (2021) 65 Cal.App.5th 199, 212 ["Because defendant failed to make the contention that his sentence constituted cruel and unusual punishment in violation of the Eighth Amendment or article I, section 17, of the California Constitution in the trial court, he has forfeited the issue. . . . [T]he analysis requires a 'fact specific' inquiry [citation], and those facts and their import to the analysis must be developed in the trial court"]; *People v. Baker* (2018) 20 Cal.App.5th 711, 720 ["A claim that a sentence is cruel or unusual requires a 'fact specific' inquiry and is forfeited if not

---

[7] Relatedly, he also states that "because the applicability of the Racial Justice Act in sentencing was new ground at the time of [defendant's] sentencing, and thus not raised by trial counsel, to the extent further development of the record would assist this Court in determining the merits of [his] challenge to his sentence as cruel or unusual in light of the Racial Justice Act objectives, [defendant] submits this matter should be remanded for that purpose rather than the issue being rejected outright." To clarify, the Racial Justice Act took effect on January 1, 2021, and defendant was sentenced nearly two years later, on November 1, 2023.

raised below"]; see also *People v. Singh* (2024) 103 Cal.App.5th 76, 115.)

Insofar as we nonetheless have discretion to undertake in the first instance the factbound but legal analysis of whether the sentence defendant received was cruel or unusual (see generally *In re Palmer* (2021) 10 Cal.5th 959, 973 [requiring analysis of "the nature of the offense and the offender, with particular attention to the degree of danger both pose to society"; a comparison of the punishment imposed with the punishment of "more serious offenses"; and a comparison of the punishment imposed in other jurisdictions for the same offense]), we decline to exercise it.  (See, e.g., *People v. Stowell* (2003) 31 Cal.4th 1107, 1114 [explaining "strong policy reasons" support the rule that an appellate court generally will not consider claims of error not raised in the trial court].)  In addition, and because a cruel or unusual punishment claim at least partly turns on the facts of a particular case, there is no reason to conclude the argument that defendant makes only now would have been futile to make in the trial court.

> D.    *The Trial Court's Denial of Defendant's Request to Strike the Firearm Sentencing Enhancements Was Not Error*

Defendant argues the trial court erred "in declining to exercise its discretion to strike the enhancements or impose a concurrent term."  His opening brief does not specify what enhancements he is referring to, nor does he thereafter present any argument about what term he thinks should have been imposed concurrently.  The most he offers is a statement in his reply brief acknowledging section 1385.1 "may not . . . give a

15

court discretion to strike the non-duplicative special circumstance finding to prevent LWOP sentencing" but arguing "the court still had discretionary sentencing decisions, such as whether to strike or reduce the firearm enhancement terms under section 1385." We accordingly construe his argument to challenge the failure to strike the firearm sentencing enhancements (that do not alter the LWOP term) under section 1385.

Under that statute, a trial court may strike or dismiss a sentencing enhancement in furtherance of justice "unless the court finds dismissal of the enhancement would endanger public safety." (§ 1385, subds. (a), (b)(1), (c)(1)-(2).) Section 1385 identifies various circumstances the court should give "great weight" when exercising the discretion it confers. Those circumstances include: "(A) Application of the enhancement would result in a discriminatory racial impact . . . . [¶] (B) Multiple enhancements are alleged in a single case. In this instance, all enhancements beyond a single enhancement shall be dismissed. [¶] (C) The application of an enhancement could result in a sentence of over 20 years. In this instance, the enhancement shall be dismissed. [¶] (D) The current offense is connected to mental illness. [¶] (E) The current offense is connected to prior victimization or childhood trauma. [¶] . . . [¶] (G) The defendant was a juvenile when they committed the current offense . . . ." (§ 1385, subd. (c)(2).)

In imposing sentence, the trial court acknowledged defendant was "young" at the time of the killings and had no prior criminal record. The court, however, ruled it would not strike any of the firearm enhancements the jury found true because it found defendant was a "danger to the community." Defendant argues this finding was based on a factual

16

misapprehension because he believes the evidence shows Antonelos's murder was a random, unintended, "line-of-fire shooting." That is wrong for two reasons. First, and most obviously, even if defendant's characterization of the evidence pertaining to Antonelos's murder were correct, there is still ample basis to find he posed a danger to the community. Those who unintentionally kill bystanders that are in the line of fire of a premeditated murder target are highly dangerous to the community all the same. Second, defendant's characterization of Antonelos's murder is at odds with evidence at trial, which the trial court could have appropriately credited, that defendant intentionally murdered Antonelos even if he did so without premeditation. In his recorded conversation with the undercover officer, defendant said he shot Antonelos because the latter tried to help others in the restaurant, which conflicted with his practice of "tak[ing] over the scene" when he commits a crime.

>    E.    *The Trial Court's Youthful Parole Hearing Remark*
>           *Did Not Influence the Sentence Imposed*

Defendant additionally argues the trial court may have erred in exercising its sentencing discretion because it mistakenly thought he would be entitled to a youth offender parole hearing. He is correct that at one point during sentencing the trial court made the remarks we have already quoted, i.e., that defendant as "a youthful offender . . . will have at some point a parole hearing" but the court was "sentencing [him] this way because [it] believe[d he was] a danger to the community and [he] ha[d] a mentality of someone who is willing to kill, and [he] deserve[d] to stay in prison, in my opinion . . . ." It is apparent, as the law stands now, that defendant will not get such a hearing

17

(§ 3051, subd. (h); *People v. Hardin* (2024) 15 Cal.5th 834, 838-839), but the court's remarks themselves demonstrate the court's contrary belief did not adversely impact the sentence imposed. In making its comments, the court was effectively conceding it could not control what a parole board might later do but it was exercising its discretion to impose a sentence that would ensure, to the extent possible, defendant would stay in prison, which is where the court believed he should remain.

> F. *Remand for Resentencing Is Not Required for Correction of Minor Errors in Imposing and Memorializing Defendant's Sentence*

A review of the reporter's transcript of the sentencing hearing, the minute order from that hearing, and the abstract of judgment reveals several errors and omissions that require correction. We shall enumerate them. But "[b]ecause the resentencing court . . . imposed the maximum possible sentence, . . . there is no need to remand the matter to the trial court to exercise its sentencing discretion anew." (*People v. Buycks* (2018) 5 Cal.5th 857, 896, fn. 15; accord *People v. Lopez* (2019) 42 Cal.App.5th 337, 341-342.) Instead, we shall exercise our authority to make certain modifications and require the trial court to incorporate those modifications in a corrected minute order and amended abstract of judgment.

> 1. *The sentence for Garcia's murder*

For Garcia's murder, the trial court imposed a sentence of 50 years to life (25 years to life for the murder plus another 25 years to life for the firearm enhancement) plus LWOP due to the true finding on the multiple murder special circumstance

allegation.  This was error because the punishment for first degree murder where a multiple murder special circumstance allegation has been found true is LWOP alone.  (§ 190.2, subd. (a)(3); *People v. Rodriguez* (1998) 66 Cal.App.4th 157, 164 ["The finding of a special circumstance thus eliminates the possibility of a 25-year-to-life sentence and leaves only the sentencing options of death or LWOP"].)  We will accordingly strike the 25 year to life sentence for Garcia's murder which will leave only an LWOP sentence for that crime.

### 2.　*The sentence for Antonelos's murder*

For Antonelos's murder, the trial court sentenced defendant to 15 years to life at the hearing, which was correct. (§ 190, subd. (a); *People v. Barnwell* (2007) 41 Cal.4th 1038, 1047- 1048 & fn. 7 ["the correct sentence for [second degree murder] is a state prison term of 15 years to life"].)  The minute order and abstract of judgment, however, reflect a sentence of 25 years to life for Antonelos's murder.  Where there is a discrepancy between the oral pronouncement of a sentence and the sentencing minute order or abstract of judgment, the oral pronouncement ordinarily governs.  (*People v. Price* (2004) 120 Cal.App.4th 224, 242.)  We direct the trial court to correct the minute order and abstract of judgment to reflect a sentence of 15 years to life for defendant's murder of Antonelos.

### 3.　*Punishment for the multiple murder special circumstance*

The information alleged, and the jury found true, two multiple murder special circumstance allegations—one for each murder.  The trial court erred by allowing the jury to make

19

multiple-murder special circumstance findings as to each murder count. (*People v. Avena* (1996) 13 Cal.4th 394, 425 ["The information alleged two multiple-murder special circumstances, one in connection with each murder, and the jury found both true. Defendant contends only one special circumstance finding is proper under such circumstances. He is correct . . . ; one of the findings should be stricken"]; *People v. Anderson* (1987) 43 Cal.3d 1104, 1150.) In addition, at the sentencing hearing the trial court sentenced defendant to LWOP but did specify it was imposing that sentence only on the conviction for murdering Garcia, which was the only count on which an LWOP sentence was authorized. (§ 190.2, subd. (a) [LWOP permitted only for a first degree murder conviction].)

We therefore modify the judgment by striking the multiple murder special circumstance finding on the count one conviction for murdering Antonelos. The abstract of judgment, which does not reflect a sentence of LWOP for either murder conviction, should be amended to indicate a sentence of LWOP was imposed for the murder of Garcia.

### 4. *Punishment for the firearm enhancements*

For each murder conviction, the trial court orally imposed sentence for the jury's associated section 12022.53 sentencing enhancement true finding that carries the longest term: the subdivision (d) finding that carries a sentence of 25 years to life in prison. That action was consistent with the statute. (§ 12022.53, subd. (f) ["Only one additional term of imprisonment under this section shall be imposed per person for each crime. If more than one enhancement per person is found true under this section, the court shall impose upon that person the enhancement

20

that provides the longest term of imprisonment"].)  The minute order and the abstract of judgment, however, indicate a sentence of 15 years to life for a firearm enhancement finding on Antonelos's murder.  That requires correction.

Relatedly, the record is unclear as to the trial court's disposition of the two lesser section 12022.53, subdivision (b) and (c) firearm enhancements.  They were not mentioned by the court or the parties during the sentencing hearing.  The associated minute order, however, states the trial court struck the section 12022.53, subdivision (c) enhancements.  Under the circumstances (including the trial court's comments at sentencing), we construe the trial court to have imposed but stayed the two sets of lesser firearm enhancements and we will direct the trial court to amend the minute order and abstract of judgment accordingly.[8]

---

[8]     That is consistent with the defense's sentencing memorandum, which urged the trial court to stay (not strike) all sentencing enhancements.

## DISPOSITION

The judgment is modified to reflect defendant was sentenced on count 2 (Garcia's murder) to LWOP based on a multiple murder special circumstance found true by the jury plus 25 years to life for the section 12022.53, subdivision (d) true finding, and on count 1 (Antonelos's murder) to 15 years to life for second degree murder plus 25 years to life for the section 12022.53, subdivision (d) true finding. The multiple murder special circumstance finding on count 1 is stricken and the section 12022.53 subdivision (b) and (c) firearm enhancement findings on both counts should be memorialized as having been imposed and stayed. As so modified, the judgment is affirmed. The clerk of the superior court is directed to deliver an amended abstract of judgment reflecting these modifications to the Department of Corrections and Rehabilitation, and to correct the November 1, 2023, minute order as specified in this opinion.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


BAKER, J.

We concur:


HOFFSTADT, P. J.


KIM (D.), J.

22